# Wytheville.

BAKER AND OTHERS V. BERRY HILL MINERAL SPRINGS CO.

June 10, 1909.

1. EQUITY PLEADING—*Multifariousness.*—In a general way, a bill is said to be multifarious which improperly joins entirely distinct and independent causes of action against one or more defendants, or impleads several defendants touching matters of a distinct and independent nature, but in cases involving the question of fraud, a very great latitude is allowed in pleading, both as to the circumstances charged and parties impleaded, provided one connected scheme of fraud be averred. If justice can be conveniently administered by the mode of procedure adopted, the objection of multifariousness will not lie, unless it is so injurious to one party as to render it inequitable to accomplish the general good at his expense.

2. EQUITY PLEADING—*Prayer for Alternative Relief—Demurrer.*—A bill is not objectionable on the ground that it contains a prayer for relief framed in the alternative. That is the common and correct practice where the exigencies of the case require it.

3. STATUTE OF FRAUDS—*Debt of Another—Original Promise.*—An agreement by a bank to discount notes with certain collateral, and to carry the loans until a third party can sell the collateral at a stated price and pay the notes from the proceeds, is an original undertaking on the part of the bank, and need not be in writing, although the discount is a part of a scheme on the part of such third person to defraud the makers.

4. PAROL EVIDENCE—*Fraud in Procurement of Contract.*—Parol evidence is always admissible to avoid a written contract procured by false and fraudulent representations.

5. RESCISSION—*Fraud—Ultra Vires Contract.*—In a suit against a corporation to rescind a contract on the ground of fraud in its procurement, if a proper case for rescission be made out, the fact that the contract is *ultra vires* and not enforceable is immaterial.

Appeal from a decree of the Circuit Court of Culpeper county. Decree in favor of one of the defendants. Complainants appeal.

*Reversed.*

The opinion state the case.

*Rixey & Hiden, John S. Barbour* and *E. Hilton Jackson,* for the appellants.

*Grimsley & Miller, Waite & Perry* and *Edwin H. Gibson,* for the appellees.

WHITTLE, J., delivered the opinion of the court.

From the decree sustaining the demurrer of the Culpeper National Bank to the original and amended bills, and dismissing the cause as to that defendant, this appeal was allowed.

The case stated is as follows: The appellants, Kate M. Baker. Mary E. Middleton and Alice Tapp, were the owners of 1,000 acres of land in Culpeper county, known as Berry Hill, upon which property there is a valuable mineral spring. In September, 1902, the appellants sold and conveyed the spring with 169 3-4 acres of the farm attached to the Berry Hill Mineral Springs Company (a West Virginia corporation having an authorized capital of $150,000, divided into shares of $10 each) for 600 fully paid and non-assessable shares of stock, and $45,000, evidenced by the company's three notes for $15,000 each, payable, without interest, at 12. 18 and 24 months from date, secured by a trust deed as the first lien upon the property conveyed. At the date of the sale, there were trust deeds amounting to $7,000 on the entire farm.

The company defaulted in the payment of these notes and other obligations, and thereupon S. R. Smith and W. E. Coons, who were two of the largest stockholders, devised a scheme for reorganizing the company in the same name but under a new

charter to be obtained in the District of Columbia, with the ulterior purpose of fraudulently depriving the appellants of their lien, indeed of their entire holdings in the original company. The capital stock of the new company was to be $150,000, one-third thereof 8% guaranteed preferred, and two-thirds common. In furtherance of their design, Smith and Coons called on the appellants at their home in the fall of 1904, and procured the surrender of their interest in the old company and the relinquishment of their lien upon the land for the unpaid purchase money notes by a series of false and fraudulent representations and promises. They represented and agreed that the new company would issue to appellants $40,000 of its stock, fully paid and non-assessable, in the proportion of one-third preferred and two-thirds common, appellants to deposit in the treasury of the company $7,500 of the new stock as indemnity against the trust deeds of $7,000 which rested on the Berry Hill farm at the date of the original sale. Smith and Coons also agreed, on behalf of the new company and of themselves individually, to guarantee to appellants an 8% annual dividend on their preferred stock from January 1, 1906, until redeemed, and to redeem the stock at par within two years from that date. They further promised that no stock of the company should be sold at less than par, and none of it at any price until after the $7.500 of stock deposited by the appellants with the company had been first disposed of and the proceeds applied in discharge of the trust deeds on the Berry Hill farm. They represented that Smith had bound himself for the term of ten years to furnish sufficient capital to finance the company and place it on a solid basis; and that within two years all the stock owned by appellants would either be redeemed by the company or purchased by Smith personally at par.

It is likewise distinctly alleged, as part of the plot to defraud the appellants, and as one of the principal inducements held out to them to enter into the proposed arrangement and to

surrender their rights in the old company, that Smith, who was the president of the bank and expressly authorized to speak and contract for it, represented to appellants and promised and agreed that the bank would, as part of the plan of reorganization and to make it effective, carry for them until their stock was sold by Smith certain notes not exceeding $4,-500, to be secured by the delivery of so much of the stock of the company as the bank might require as collateral; that appellants should not be called on for payment of these notes, which were to be renewed from time to time and carried by the bank as renewals, until Smith disposed of the stock at par and with the proceeds took up the notes; that afterward in pursuance of the agreement, the bank discounted appellants' notes aggregating $3,500 or $4,000, and required the deposit of 600 shares of stock of the company as collateral security; that, at the time of discounting these notes and accepting the collateral, the bank had full knowledge of the promises and representations which had been made in its behalf in that regard and of all the details of the plan of reorganization of the old company, and of the fraudulent purpose of Smith and Coons in promoting the scheme, and that the discount of the notes under the agreement for renewals with the stock of the new company pledged as collateral was part and parcel of the contrivance to control the situation and to defraud the appellants and deprive them of their property; that appellants had no suspicion of the honesty of purpose and good faith of Smith and Coons until after the notes had been discounted, with the stock of the new company as security, and until after their stock, interests and securities in the old company had been surrendered and released. Then for the first time they were furnished with what purported to be copies of the minutes of both companies, showing what action had been taken in reorganizing the company, and discovered that they had been grossly misled, deceived and defrauded.

The original bill sets out categorically the representations,

promises and undertakings of the defendants, Smith and Coons, by which the appellants were induced to fall into their fraudulent scheme, and the falsity thereof.

The bank refused to carry out its contract in regard to renewing the notes, and caused actions at law to be instituted thereon. The appellants offered to return, and tendered all the stock issued to them by the new company (except that held by the company as indemnity against the $7,000 liens, and the 600 shares delivered to the bank), and the prayer of the bills is, that the contract thus fraudulently procured from them be rescinded, and that they be restored to their original rights; and, incidentally, an injuction is prayed for to restrain the bank from prosecuting the actions at law on the notes, and from disposing of the 600 shares of stock pledged to it as collateral security. Alternately, the bills pray that, in the event the contract cannot be rescinded, it may be reformed and executed by the parties and specifically enforced.

We have carefully considered all of the grounds of demurrer to these bills assigned by the bank, and shall now briefly address ourselves to such of them as demand notice.

In the first place, it is insisted that the original and amended bills, considered either jointly or severally, are multifarious.

In a general way a bill may be said to be multifarious when it improperly joins entirely distinct and independent causes of action against one or more defendants, or impleads several defendants touching matters of a distinct and independent nature. Story's Eq. Pl., sec. 271.

Tested by that rule, these bills are not amenable to objection. It is true the alleged fraudulent scheme for the reorganization of the old company involves numerous incidents, but they all constitute parts of a common and connected plan on the part of the projectors to defraud the appellants and appropriate to appellees' use the holdings of appellants in the original company.

"In cases involving the question of fraud, a very great lati-

tude is allowed in pleading, both as to the circumstances charged and the parties impleaded, provided one connected scheme of fraud be averred.   If justice can be conveniently administered by the mode of procedure adopted, the objection of multifariousness will not lie, unless it is so injurious to one party as to render it inequitable to accomplish the general good at his expense."   *Garret* v. *Finch,* 107 Va. 25, 27, 57 S. E. 604, 1 Va. App. 150; *Jordan* v. *Liggan,* 95 Va. 616, 29 S. E. 330.

Nor are the bills objectionable on the ground that they contain a prayer for relief framed in the alternative.   That is common and correct practice where the exigencies of the case require it.   *Garrison* v. *Hall,* 75 Va. 150; *Bank* v. *Thornton,* 83 Va. 157, 2 S. E. 193; *Nunnally* v. *Strause,* 94 Va. 255, 26 S. E. 580.

Again, the objection that contrary to the statute of frauds the bills seek to charge the bank for the debt, default, or misdoings of Smith without a promise in writing, proceeds upon a misconception of the allegations.   The agreement of the bank was charged to be original and not collateral, and its undertaking was separate and distinct from that of Smith. The bank was to discount certain notes for appellants with part of their stock pledged as collateral for the loans, and to carry the loans upon renewals until Smith sold the stock and paid the notes with the proceeds.

"Nobody else had assumed any undertaking *similar* to that of the bank.   Its undertaking could not be a collateral promise."   *Merritt* v. *Inglesby, Trustee,* 28 Vt. 157.

The authorities recognize the distinction between promises which are direct and original, though subsidiary or secondary to the principal promise, and such as are collateral merely. *D'Wolf* v. *Raband,* 1 Pet. 476, 500, 7 L. Ed. 227; Brown on Stat. of Frauds (4th ed.), sec. 175.

Another ground of demurrer relied on is, that the bills set up a parol agreement in conflict with and in contradiction of

the written agreement. The notes held by the bank, it is said, are written promises, absolute on their face, to pay specific amounts on days certain and without condition; that the contemperaneous parol agreement alleged in the bills is, that these notes were not to be paid at maturity but were to be renewed from time to time until paid from the proceeds of sale of the hypothecated stock.

The proposition is founded upon the parol evidence rule, that a contract in writing complete on its face cannot be altered or contradicted by such evidence of an inconsistent agreement previously or contemporaneously made. But there is a well recognized exception to the general rule within which this case falls, namely, that when the written contract is procured by false and fraudulent representations parol evidence is always admissible to avoid it.

The exception is thus stated in *Clinch Valley Coal & Iron Co.* v. *Williams,* 180 Pa. 165, 36 Atl. 737, 57 Am. St. 626:

"The execution of a contemporaneous parol agreement between the parties, under the influence of which a note or contract has been signed, which is violated as soon as it has accomplished its purpose in securing the execution of the paper, may always be shown where the enforcement of the paper is attempted. It is a plain fraud to secure the execution of an instrument by representations as to the manner in which payment shall be made, differing in important particulars from those contained in the paper, and, after the paper has been signed, attempt to compel literal compliance with the terms, regardless of the contemporaneous agreement without which it never would have been signed at all."

So, in Smith on the Law of Fraud, section 265, it is said: "Parol testimony is admissible to show that the execution of a written contract was brought about by fraudulent representations. Such evidence as will lay the foundation for an action for deceit or a ground for the recission of the contract is always receivable, although it may consist of oral representations."

*Cummings* v. *Cass,* 52 N. J. L. 77, 18 Atl. 972; *Goodwin* v. *Horne,* 60 N. H. 485; *Langlely* v. *Rodriguez,* 122 Cal. 980, 55 Pac. 406, 68 Am. St. 70, 72; *McLean* v. *Life Ins. Co.,* 29 Gratt. 361; *Nash* v. *Fugate,* 32 Gratt. 595, 34 Am. Rep. 780.

The last ground of demurrer which we shall notice denies the power of the bank, under the revised statute of the United States, known as "The Statute Controlling National Banks," to make or authorize the contract or representations alleged in the bills. Assuming, only for the purposes of this assignment however, the correctness of that construction of the Act of Congress the contention loses sight of the fact that the primary purpose of the suit is to rescind and not to enforce the alleged *ultra vires* contract. If, therefore, at the hearing on the merits, the appellants shall make out a proper case for rescission on the ground of fraud, the fact that the contract is *ultra vires* and not enforceable becomes immaterial.

For these reasons, the decree appealed from must be reversed, the demurrer of the Culpeper National Bank to the original and amended bills overruled, and the cause remanded to the circuit court for further proceedings to be had therein not in conflict with the views expressed in this opinion.

*Reversed.*