The following issues were submitted:
1. Did the defendant execute the contract, notes, and mortgages alleged in the complaint? Answer: Yes.
2. Did the defendant accept, the engine and fixtures after demonstration and inspection of same by him, as alleged in the complaint? Answer: No.
3. Were the said notes, contract, and mortgage procured from defendant by false and fraudulent representations of the plaintiff's agent, as alleged in the answer? Answer: Yes.
4. Is the defendant indebted to the plaintiff, and if so, in (586) what amount? Answer: Nothing.
5. In what amount, if anything, is the plaintiff indebted the defendant on account of money paid on the machinery to the plaintiff by the defendant? Answer: $500, with interest.
6. In what amount, if anything, is plaintiff indebted to the defendant for expenses incurred in the endeavor to operate the machinery and other expenses incurred in connection with said machinery, as alleged in the counterclaim of defendant as set forth in the answer? Answer: $231.
From the judgment rendered, the plaintiff appealed.
This action is brought to recover on notes of defendant aggregating $1,774, given for the purchase of a traction engine sold to defendant by plaintiff's agent, one Crutchfield.
The defendant for answer sets up two defenses: First, that the plaintiff warranted the quality and suitableness of the engine for the purposes intended, and avers a breach of said warranty; second, that defendant was induced to enter into said contract by reason of the false and fraudulent representations of Crutchfield, the selling agent of plaintiff.
The defendant appears to have relied solely upon the last named *Page 477 
defense, and as no issue was submitted upon the question of false warranty, we will not consider that aspect of the case.
There is this difference: A party relying upon a written warranty of quality in the sale of personal property is bound by the terms of the warranty, and must comply with them in order to recover. Piano Co. v.Kennedy, 152 N.C. 196. Whereas the defense of fraudulent representations, whereby one is induced to enter into a contract, is not founded on the contract, but, when established, vitiates and destroys it, and the restrictive stipulations contained in the contract fall with it. For this reason the contention of the plaintiff that much of the evidence tends to vary the written contract cannot be sustained. (587)
The case of Etheridge v. Palin, 72 N.C. 216, has no application. In that case the attempt was to vary the contract of warranty.
The defense of fraud does not change the contract, but nullifies it, and is competent for that purpose, as held in Tyson v. Jones, 150 N.C. 181;Whitehurst v. Insurance Co., 149 N.C. 273.
In Tyson v. Jones it was held that false and fraudulent representations sufficient to avoid a written contract may be shown by parol as a defense in an action for damages alleged to have been sustained by its breach, as such does not tend to vary or contradict the writing, but to render the entire instrument void.
To same effect, Bank v. Chase, 151 N.C. 108; Basnight v. Jobbing Co.,148 N.C. 350; Gwaltney v. Insurance Co., 132 N.C. 928; Insurance Co. v.Knight, 160 N.C. 592.
It is contended that the contract contains a clause limiting the authority of the selling agent, and that McKay, being able to read, is fixed with knowledge of such clause.
This position might be well taken if the defense was based upon the contract, but it is well settled that a clause in a sale contract exempting the seller from liability for its agent's representations at variance with the contract, does not protect the seller where the contract was void by reason of the agent's fraud. Machine Co. v. Bullock, ante, 1.
In Unitype Co. v. Ashcraft, 155 N.C. 63, it was said: "The declarations made by the agent were made by him dum fervet opus, and his principal must be considered as bound by them as much so as if it had made them itself."
As said in Peebles v. Guano Co., 77 N.C. 233, "A corporation can only act through its agents, and must be responsible for their acts. If a manufacturing corporation is not responsible for the false and fraudulent representations of its agents those who deal with it will be practically without redress, and the corporation can commit fraud with impunity."Manufacturing Co. v. Davis, 147 N.C. 267; Food Co. v. *Page 478 Elliott, 151 N.C. 393; Manufacturing Co. v. Feezer, 152 (588) N.C. 516.
Several prayers for instruction bring up for review the sufficiency of the evidence of fraud.
To justify a finding for the defendant upon the third issue, relating to the fraudulent representations of Crutchfield, the agent of plaintiff, the evidence must tend to prove: (1) That the representations were made; (2) that the agent knew they were untrue, and made them with intent to deceive; (3) that the defendant acted in reliance thereon in purchasing the engine.
We think there is sufficient evidence to be submitted to the jury upon each of these three elements of fraud.
The representations are established not only by the evidence of the defendant, but by that of Crutchfield himself, who testified as follows:
"I was salesman and expert for company; went around selling machines; it was usual to demonstrate their qualities; McKay told me he wanted an engine to haul lumber, and showed me road and said he wanted to haul from 4,000 to 5,000 feet at a load and make two trips a day; if he could get an engine that would do that, he wanted it. He said it cost him $1.50 to haul with wagons, and wanted engine to reduce cost.
"I told McKay I thought that engine could haul 5,000 feet and make two trips per day. I told him this more than once. I told him that it would haul from 4,000 to 5,000 feet and make two trips per day under ordinary conditions of weather and roads, if he would make improvements on road. I thought engine would do what he wanted it to do. I told him so. The only thing he told me he wanted to do was to reduce hauling expenses. After it would not work, we talked about it, and I told him I thought it would do it."
The defendant testified: "I told him I would buy an engine if it would reduce the cost of hauling sufficient to justify it; told him it was costing me $1.50 per thousand; showed him the road; he told me if I bought this engine I could reduce cost considerably; that it would not cost more than $4 per day to operate it and could not make two trips a day and easily carry 5,000 feet at a trip. . . . I would not have bought the engine but for those representations. I told Crutchfield (589) repeatedly that I would have to rely upon what he said about it. I had had no experience in operating traction engines. . . . He said he guaranteed that it would haul 10,000 feet a day and make two trips per day and would improve the road in running over it."
B. F. Faircloth testified: "Crutchfield said to McKay he could haul two trips and make 5,000 feet a trip in one day." *Page 479 
Jasper Bullock testified: "Crutchfield told him he would guarantee it would give satisfaction; that it would make two trips and haul 5,000 feet in a day; that he would guarantee it."
R. T. Cobb testified: "Crutchfield said it would haul 5,000 feet and make two loads a day. He said he would guarantee it, and if it did not, it was not McKay's engine."
D. F. Hester testified: "McKay told Crutchfield he wanted an engine that would haul 5,000 feet at a load and make two loads a day. Crutchfield said that the engine would do that; that he would guarantee it."
D. F. McCormick testified: "Heard Crutchfield say damned old thing was worn out before it came here; ought to have been on scrap pile."
There is abundant evidence tending to prove the falsity of Crutchfield's declarations; that the engine utterly failed to come up to the representations; that although handled by men pronounced competent by the agent himself, and although the road was properly repaired and weather was good, it never averaged even one trip a day or even 1,500 feet of lumber. Instead of decreasing the cost below $1.50 per thousand, it increased the cost to $10.44 per thousand, not counting the cost of the engine.
In addition to this, in hauling 20 loads, it constantly broke down; the hubs broke; several spokes came out; cog gearing slipped and broke; clutch broke; gearing broke, etc. McKay spent over $150 in repairs in trying to operate it. It was never made to work, and after faithful trial was abandoned and plaintiff was notified to remove it.
That Crutchfield knew of the worthless character of the engine before he shipped it to the defendant is shown by his statement (590) to McCormick, quoted above.
The plaintiff further contends that the defendant accepted the engine after demonstration by Crutchfield, and that such acceptance is a bar to his defense.
The plaintiff's evidence tends to prove that after Crutchfield had demonstrated the engine five days, the defendant then signed the written contract, Exhibit "A," paid Crutchfield $500 in cash and signed the notes and mortgage. At same time McKay also signed the "satisfaction slip" reading as follows:
HAMER, S.C., 11 April, 1906.
J. I. CASE THRESHING MACHINE COMPANY, Racine, Wis.
GENTLEMEN: — Your Mr. J. T. Crutchfield has rendered us the desired assistance in operating the machinery recently purchased from you, and we are well pleased with the same. Engine No. 16013.
J. W. McKAY. *Page 480 
The defendant's evidence tends to prove that the engine was operated three days before contract was signed. It did not come up to representations. It was admitted that it rained constantly during that time; that the roads had not been repaired and were in very bad condition. Plaintiff's agent had to leave, and insisted that the contract be signed. Defendant refused to do so. The agent then assured defendant that the failure of engine to come up to representations was due to the weather and roads, and guaranteed that it would come up to representations in good weather when the road had been repaired.
He further agreed that if it did not do so, the contract and notes should be returned to defendant and the trade canceled. Defendant told the agent he had no way of knowing what it would do, but that he would sign the contract upon the guarantee that if, in good weather and after repairing the roads, the engine failed to come up to specifications, the notes and contract were to be returned to him and the trade canceled.
We do not think the court would have been justified in holding (591) as a matter of law that there was a final and unconditional acceptance of the engine after examination by defendant himself.
Defendant testified that he told plaintiff's agent when he signed the notes and slip that he knew nothing about that character of engines, and that he relied upon his representations and judgment.
According to defendant's version of the matter, if he accepted the engine, he did it relying upon Crutchfield's representations, and not upon his own examination.
But even if defendant was under obligations to make an examination for himself before signing the contract, plaintiff cannot set up his failure to do so in excuse of the fraud of its agent. Machine Co. v. Bullock, ante, 1.
See also Griffith v. Lumber Co., 140 N.C. 514; Hill v. Brown,76 N.C. 125; Leonard v. Power Co., 155 N.C. 15.
As to the "satisfaction slip," the contention of plaintiff that the signing of it bars defendant's defense cannot be maintained.
There was evidence that this slip was of same size and character as the notes; that they were spread out on a table shingle fashion; that the defendant was told there were the notes, and he signed under this apprehension.
His Honor submitted this to the jury under instructions that if defendant knew what he was signing he was bound thereby; but that if, upon the contrary, he signed the paper under a belief that it was a note, then he would not be bound thereby.
We do not think the plaintiff can justly complain of his Honor's ruling in respect to this so-called "satisfaction slip." In our opinion, *Page 481 
it amounts to nothing more than an expression that the defendant was pleased with the engine at that time, only a few days after its arrival. He had not then discovered its worthless character, and that, as Crutchfield told McCormick, "It ought to have been on the scrap pile."
It is contended that defendant retained the engine and tried to work it for such a length of time as precludes him from rescinding the contract upon any ground.
It was in evidence that as soon as defendant ascertained the engine would not haul the quantity of lumber represented, even (592) after the road was repaired and the weather cleared off, he at once wrote the company. They sent a man to put it in shape. This effort failed.
The defendant then (as suggested by plaintiff) ordered certain new parts and renewed the attempt to make it operate successfully. This being a failure, plaintiff's agent invited defendant to Greensboro for a conference.
As long as a year after the execution of the notes, defendant agreed to pay them, provided the engine could be made to come up to representations.
When he finally ascertained that it was absolutely impossible to make the engine perform the services, he put it aside and has not used it since.
He made in all not more than twenty trips with it. He tendered it back promptly to plaintiff. Defendant, having retained the engine under these circumstances, at the request of plaintiff, trying to make it perform the service it was represented as capable of performing, is not barred from asserting his right of rescission upon the ground of fraud in the purchase.
There are fifty-four assignments of error in this record. We have examined them and find them to be without merit. We content ourselves with reviewing the salient points of the case.
No error.
Cited: Guano Co. v. Live Stock Co., 168 N.C. 447. *Page 482 
(593)