## 𝔚𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## WHITE SEWING MACHINE COMPANY V. GILMORE FURNITURE COMPANY.

### November 18, 1920.

1. SALES—*Fraudulent Representations of Agents—Stipulation in Contract Limiting Authority of Agent.*—A clause in a sale contract exempting the seller from liability for its agent's representations at variance with the contract does not protect the seller where the contract is void by reason of the agent's fraud. Such a clause does not refer to false and fraudulent representations of fact, and if it did would be unavailing, because a principal cannot by any such clause or other device relieve himself of the consequences of the fraud of his own agent while claiming the benefit of the contract.

2. SALES—*Fraudulent Representations of Agents—Stipulation in Contract Limiting Authority of Agent—Case at Bar.*—In the instant case an order was obtained by plaintiff from defendant, a retail dealer, for the purchase of a carload of sewing machines by means of the fraudulent representations of plaintiff's agent. The order contained a clause that no claim of any understanding or agreement between the plaintiff company and purchasers would be recognized unless in writing and accepted by the company. It was contended that by reason of this clause it was error for the trial court to allow the introduction of a personal agreement signed by the agent guaranteeing the fulfillment of certain representations made by him upon the ground that such agreement varied the written contract.

   *Held:* That this contention misconceived the true nature of defendant's defense, which was not an attempt to hold plaintiff responsible for the agent's personal contract, but an effort to recover damages resulting from the contract, which was induced by false representations of the agent, and for which plaintiff assumed responsibility by claiming the benefit of that contract after full notice of the agent's chicanery.

3. SALES—*Fraudulent Representations of Agent—Parol Evidence.*—Parol evidence is admissible to prove that a contract of sale was induced by the fraudulent representations of seller's agent,

notwithstanding a clause limiting the authority of the selling agent, and exempting the seller from liability for representations of its agent at variance with the written contract.

4.  SALES — *Fraudulent Representations — Reliance on Representations—Presumption of Reliance.*—Of course, the false representation which is relied upon to escape the binding effect of a contract must be relied upon by the vendee at the time the contract is entered into; but when the vendor has made a false representation, which from its nature is likely to induce a buyer to enter into a contract on the faith of such representation, it will be inferred that the vendee was induced thereby to make the contract, and he is not required to show that he in fact relied upon the representation. If the seller wishes to discredit this natural inference, he must prove either that the buyer knew that the representation was false, that he expressly stated in terms, or showed by his conduct that he relied upon his own judgment and not upon the false representation.

5.  APPEAL AND ERROR—*Assignment of Error—General Objections.*— A certificate of exception to the testimony of a witness showed in general terms that counsel objected to the introduction of the witness's testimony. As there were fifteen questions and answers, this was entirely insufficient to sustain the exception. The exceptor should designate the particular questions and answers his exceptions relate to. The Supreme Court of Appeals will not endeavor, where some of the evidence is clearly admissible and some may be inadmissible, to discover the objectionable portions of the testimony.

6.  SALES—*Evidence—Admissibility—Res Gestae—Appeal and Error—Harmless Error.*—In an action by seller for the purchase of sewing machines, which buyer was induced to purchase by the fraudulent representations of seller's agent in regard to a scheme to aid the buyer in reselling the machines, the personal guaranty of the agent of the reselling scheme, while not admissible for the purpose of varying or contradicting the contract of sale, was admissible as a part of the *res gestae*—the attending circumstances and conditions under which the contract was entered into. Even if it should not have been admitted, its admission was harmless, because the jury clearly understood that it constituted no part of the contract.

7.  DOCUMENTARY EVIDENCE—*Books of Account—Identification by President of Corporation.*—The regular books of a corporation, containing the financial record of its business with the entries made contemporaneously with the transactions referred to, are admissible when they come from the proper custody, and

are identified by the president and general manager. of the corporation who also supervised the bookkeeping of the corporation, although the actual entries were made by a number of bookkeepers.

8. DOCUMENTARY EVIDENCE—*Books of Account.*—In an action by a seller for purchase price, the ledger sheets of the buyer corporation were introduced by its president showing merely the dates and amounts of debit and credit, with references to the pages of the journal and cashbook. On cross-examination, the president testified that he could not tell to whom and for what many of the amounts referred, but testified that he could go back and find out. On the next day he produced the same sheets with the names of the parties and the purposes for which the several payments had been made added, identifying the items from his examination of the cashbook and journal. As thus amended the admission of the sheets was objected to.
*Held:* That the sheets as amended were admissible. The additions to the ledger sheets were made in order to give the court, jury, and counsel such additional information as could be obtained from the books of original entry.

9. SALES—*Documentary Evidence—Work of Salesmen.*—In an action for the purchase price of sewing machines, where the defense was fraudulent representations as to a reselling scheme, the president of buyer corporation was asked whether he could show the work of each salesman from his books, and he thereupon made up some statements of the work of the various salesmen, showing the amounts collected and paid out on account of the work of each, and tendered them.
*Held:* That the court properly admitted the statements and allowed the president to testify with reference thereto.

10. DOCUMENTARY EVIDENCE—*Books of Account—Summaries in Original Books.*—Exceptions to the introduction of the ledger sheets of a corporation and summaries therefrom, whatever difference of opinion there might be as to their introduction in the first place, become immaterial and of no consequence whatever in view of the fact that the witness brought the books of original entry into the court room, and they were formally tendered as evidence, so that counsel who questioned the verity of any of the items shown by these statements had the opportunity to examine the original books and to discredit them if they could have been discredited.

11. SALES—*Instructions—Fraud of Seller's Agent—Measure of Damages.*—In an action for the purchase price of a carload of sewing machines, the defense interposed was the fraudulent representations of the seller's agent. The court instructed the jury

that the measure of damages for misrepresentation of the price at which the machines had been sold by others was "the difference between the price at which they had been sold and the price paid."

*Held:* That while not as clear as it might have been, the instruction could not have misled the jury. In substance the instruction told the jury that the measure of damages for the misrepresentation of the price at which such machines had been sold to others is the difference between such smaller price and the price fixed in the contract with the buyer, which was substantially correct.

12. SALES—*Instructions—Fraud of Seller's Agent—Measure of Damages.*—In an action for the purchase price of a carload of sewing machines, the defense interposed was the fraudulent representations of the seller's agent. The court instructed the jury that the measure of damages for false representations regarding other sales and regarding the assembling of a corps of efficient salesmen, and regarding the honest purpose of seller's agent to carry out the agreement to furnish such men, was the difference between the value of such machines if such representations had been true and their value under actual conditions.

*Held:* Correct.

13. DAMAGES—*Speculative Damages—Remote Damages—Sales—Fraudulent Representations of Agent.*—The question of damages is one peculiarly within the province of the jury, and, while a litigant cannot escape his obligation to establish his damages with reasonable certainty by the best evidence which is available, still where it is manifest that he is entitled to substantial damages and does the best he can to give the jury all of the information he possesses, he is not to be denied any recovery because he cannot demonstrate the amount of such damages with precision. Such uncertainties will always be resolved against a vendor who seeks to profit by the fraud of his own agent.

14. SALES—*Fraudulent Representations by Seller—Buyer's Damages.*—Where a retail dealer was induced to make a contract for the purchase of 150 sewing machines, at $26 each, by the fraudulent representations of seller's agent as to aid to be furnished the retail dealer in reselling the machines, and the retail dealer spent a great deal of time and money in endeavoring to sell the machines, suffering substantial pecuniary damage, all available facts being before the jury there is no sufficient reason for concluding that a verdict for $2,850 in favor of the retail dealer was excessive.

80

Error to a judgment of the Circuit Court of Albemarle county in an action of assumpsit. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*C. W. Allen, Samuel A. Anderson, Allen G. Collins,* and *White & Long,* for the plaintiff in error.

*H. W. Walsh* and *Duke & Duke,* for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

This is an action in assumpsit to recover $1,500, by the White Sewing Machine Company, a corporation, against Gilmore Furniture Company, a corporation, a balance claimed for the purchase price of a carload of 150 sewing machines. The case was tried upon the plea of non-assumpsit and two special pleas. The special pleas alleged false representations and fraud on the part of the vendor and its agent, and claimed consequential damages of $5,038.48, and sought to recover the difference against the plaintiff. The plaintiff demurred to the defendant's evidence. The jury found a verdict in favor of the plaintiff for $1,500 and in favor of the defendant for $2,850 damages, subject to the judgment of the court upon the demurrer to the evidence. The court overruled the demurrer, entered judgment in favor of the defendant for $1,350, the difference, and of this the White Sewing Machine Company is here complaining, but has failed to specify and assign errors in its petition for the writ of error with that particularity which is required. The facts appearing are substantially these: In June, 1910, N. L. Massey, as the sales agent of the White Company, approached John A. Gilmore, president of the Gilmore Company, for the purpose of making a sale of a large

number of sewing machines. Massey stated that the White Sewing Machine Company had adopted a new plan for disposing of their machines; that they had assembled a corps of efficient honest salesmen, who would come as soon as the machines arrived, and that for a commission of $6.25 on each machine they could promptly sell them, but the Gilmore Company would have to pay the board of the salesmen and furnish them with horses and buggies. Gilmore told Massey that he did not understand the sewing machine business, while Massey emphasized the fact that the honest men who were thus available would need no watching, and that he (Massey) had represented the White Company for a number of years. Then before the sale was finally consummated, Massey produced numerous letters of recommendation from Southern merchants, written on their letter heads, stating in substance that they had bought similar machines from him, and had salesmen of the sewing machine company sell them to advantage. Among other statements made by Massey was that the machines were never sold for less than $26.00 by the manufacturer. Thus induced, Gilmore signed an order for 150 machines at $26.00 each, and then seeing that the plan for selling them had not been stated in the order, called Massey's attention to this omission, to which he made this reply: "It makes no difference. This is the plan of the White Sewing Machine Company, but I will give you my personal guarantee that the plans outlined to you will be carried out." Then Massey signed a paper reading thus:

"I personally agree to furnish the Gilmore Furniture Company two salesmen to sell 150 machines, this day purchased, for them, they to pay said salesmen $6.25 commission for each machine sold and expenses and board and furnish horses and wagons, and to furnish W. T. Fitzpatrick free for one week, they to pay his board and to give demonstration of White with Art Exhibit.

"N. L. Massey."

The sewing machines came, but the honest reliable agents to sell them did not appear, for they had not been assembled either by or for the White Company. Some salesmen were sent by Massey in response to Gilmore's request, but they were inefficient and in many instances dishonest. The letters which were produced from the Southern merchants in some instances were shown to be forgeries, and in one instance to have been prepared and obtained for· purposes of deception—that is, under these circumstances: A controversy had arisen between the White Company and the People's House Furnishing Company, of High Point, N. C., upon representations by Massey in some respects similar to those he made to the Gilmore Company, and the vendee finding the representations false and the transaction entirely unsatisfactory, denied liability, and compromised his controversy with the company. As an incident of this compromise, Massey wrote a letter for the signature of the general manager of the People's House Furnishing Company, in which this is stated: "It affords me great pleasure to testify to the superior merits of the White machine. You may rest assured that we expect to continue to handle and push the sale of the White. We can cheerfully recommend the White Company to any one desiring to engage in the machine business and desire to say that our dealings with you and your representative, Mr. N. L. Massey, have been entirely satisfactory." This letter was proposed to the signer by Massey, and was signed, as he testified, because the controversy was concluded by Massey for the White Company, and allowed his company to return the machines which they had agreed to buy, and paid rent for this six months his company had stored the machines; and that he signed this letter containing these false statements at the request of Massey. He testified in this case that the statement in that letter to the effect that his dealings with Mr. Massey were satisfactory was untrue, and that it was only

made because of Massey's suggestion and in order to secure a settlement for his company in closing the transaction which had proved entirely unsatisfactory. This letter was exhibited to Gilmore before the sale which is here in controversy was made. It is also shown by the evidence in this case that machines had been sold to other dealers for less than $26.00. That these were the usual methods which Massey pursued. in order to sell machines for the White Company and that they were known to that company is perfectly apparent, because fifteen dealers from various parts of the South are introduced and showed that similar inducements in many respects had been held out to them, and in each instance the representations had proved to be deceptive and the transactions unprofitable and entirely unsatisfactory. In all of these instances there had been correspondence with the White Company, and in several cases litigation had resulted.

The Gilmore Company, in their efforts to dispose of the machines, encountered many difficulties, incurred expense, spent much time, and then finally notified the White Company that they would decline to pay the balance claimed and would claim damages because of these false representations under which they had been induced to enter into the contract.

[1-3] Much of the discussion grows out of the fact that the order which the Gilmore Company gave when the machines were purchased contains this clause: "It is understood that no claim of any understanding or agreement, of any nature whatsoever, between this company and its dealers will be recognized except such as is embraced in written orders, or in writing, and accepted by said company in writing from its home office at Cleveland, O."

It is alleged that the court erred in permitting the introduction of the personal agreement signed at the same time by N. L. Massey, upon the ground that it varies and con-

tradicts the written contract with the White Company. This, however, entirely misconceives the true nature of the Gilmore Company's claim. The pleas under which the defense is made in substance allege, that the contract under which the machines were purchased was induced by the false and fraudulent statements which N. L. Massey made as the agent of the White Company. Upon the demurrer to the evidence, it is perfectly clear that the contract was induced by these false and fraudulent statements. That the machines were sold in pursuance of a fraudulent scheme, based upon business practices which are in the highest degree reprehensible, is proved by the testimony of Gilmore, and there is no attempt to contradict any of the facts to which he testifies. This is not an attempt to hold the White Company responsible for Massey's personal contract, but an effort to recover damages resulting from the contract with the White Company, which was induced by the false statements of their agent, Massey, and for which they have assumed responsibility, because they are claiming the benefit of that contract which Massey's fraud and falsehood secured for them, and they are claiming thereunder after full notice of such chicanery.

In *Baker* v. *Berry Hill Co.*, 109 Va. 776, 65 S. E. 656, where the plaintiff sought to enjoin an action on notes alleging that they had been secured by collateral as part of a fraudulent scheme to deprive the plaintiff of certain securities and with the understanding that they were not to be enforced except as the collateral should be sold pursuant to a general scheme, it was objected that to recognize such a scheme would be a violation of the parol evidence rule; but this court held that, "The proposition is founded upon the parol evidence rule, that a contract in writing complete on its face cannot be altered or contradicted by such evidence of an inconsistent agreement previously or contemporaneously made. But there is a well recognized excep-

tion to the general rule within which this case falls, namely, that when the written contract is procured by false and fraudulent representations parol evidence is always admissible to avoid it."

The exception is thus stated in *Clinch Valley Coal & Iron Co. v. Willing*, 180 Pa. St. 165, 36 Atl. 737, 57 Am. St. Rep. 626: "The execution of a contemporaneous parol agreement between the parties, under the influence of which a note or contract has been signed, which is violated as soon as it has accomplished its purpose in securing the execution of the paper may always be shown where the enforcement of the paper is attempted. It is a plain fraud to secure the execution of an instrument by representations as to the manner in which payment shall be made, differing in important particulars from those contained in the paper, and after the paper has been signed, attempt to compel literal compliance with the terms, regardless of the contemporaneous agreement without which it never would have been signed at all.

The same principle generally prevails, and Judge Cooley, in *Laing* v. *McKee*, 13 Mich. 124, 87 Am. Dec. 738, where the plaintiff sought to recover of the defendant, a purchaser at a tax sale, certain lands which the defendant had bought in and which the plaintiff had not redeemed, relying on defendant's promise to make over to plaintiff an assignment of the certificate, the promise being shown to be fraudulent, held that the plaintiff was entitled to relief in spite of the statute of frauds, and said: "It is a matter of no moment whether the fraud was perpetrated by means of a promise upon which he (plaintiff) relied, and which defendant did not intend to keep, or by untrue statements as to existing facts."

Coming specifically to the clause purporting to exclude all agreements or understandings with the sales agent, we repeat that the Gilmore Company is not relying upon the

640 White S. Mach. Co. v. Gilmore Fur. Co., 128 Va. 630.

Opinion.

collateral understanding or agreement, which merely imposed an obligation upon Massey, but is relying upon his false representations as agent of the White Company which induced the contract of purchase. This clause does not refer to false and fraudulent representations of fact, and if it did would be unavailing, because a principal cannot by any such clause or other device relieve himself of the consequences of the fraud of his own agent, while claiming the benefit of such a contract. The door cannot thus be closed on fraud, nor can it remain buried if there be any way to unearth it.

We find this in *Crump* v. *U. S. Mining Co.*, 7 Gratt. (48 Va.) 368, 56 Am. Dec. 116:

"That a person professing to act as agent for another does so wholly without authority, or transcends the authority actually conferred upon him by his principal, is no reason for enforcing the contract against the other party when obtained from him by false and fraudulent representations. In the words of a judicious writer: 'Contracts made for the benefit of another, but without his privity or consent, may be rejected or affirmed at his election. But by making the election to affirm it he adopts that which is detrimental as well as that which is for his benefit. And in seeking to enforce contracts entered into by agents, the principal is subject to have them impeached by any conduct of his agent which would have that effect if proceeding from himself. Every species of fraud, misrepresentation, or concealment, therefore, in the agent, affects the principal's right to recover.' * * *

"It is difficult to conceive a case of an action founded upon contract of sale, to which the defense is that it was obtained by fraud, in which the acts and declarations, whether of the principal seeking to enforce the contract, or of his agent through whose intervention it was procured, occurring at the time of making it as part of the *res gestae*, are inad-

missible evidence. Such a defense does not present a naked question of law for the decision of the court; but a mixed question of law and fact for the consideration of the jury, with the aid of such instructions as the court may give in regard to the principles of law applicable to the facts that may be proved to the satisfaction of the jury."

*Owens* v. *Boyd Land Co.,* 95 Va. 560, 28 S. E. 950, enforces the same rule.

The precise question involved in the sale of machines of various kinds has frequently been considered in other jurisdictions. For instance, in *J. I. Case Threshing Co.* v. *McKay,* 161 N. C. 584, 77 S. E. 848, which was an action for the purchase price of a tractor, in which the defendant pleaded that certain false representations as to the capacity of the engine had been made to him as an inducement to purchase. In considering the effect of a clause limiting the authority of the selling agent, and exempting the seller from liability for representations of its agent at variance with a written contract, it is said: "It is contended that the contract contains a clause limiting the authority of the selling agent and that McKay, being able to read, is fixed with knowledge of such clause. This position might be well taken if the defense was based upon the contract, but it is well settled that a clause in a sale contract exempting the seller from liability for its agent's representations at variance with the contract does not protect the seller where the contract was void by reason of agent's fraud. *Machine Co.* v. *Bullock,* 161 N. C. 1, 76 S. E. 634, last term. In *Unitype Co.* v. *Ashcraft,* 155 N. C. 63, 71 S. E. 61, it was said, 'The declarations made by the agent were made by him *dum fervet opus* and his principal must be considered as bound by them as much so as if it had made them itself.' As said in *Peebles* v. *Guano Co.,* 77 N. C. 233, 24 Am. Rep. 447, 'A corporation can only act through its agents and must be responsible for their acts. If a manufacturing cor-

poration is not responsible for the false and fraudulent representations of its agents, those who dealt with it will be practically without redress and the corporation can commit fraud with impunity.' "

To the like effect is *Smith & Nixon Co.* v. *Morgan,* 152 Ky. 430, 153 S. W. 749, which was an action on a contract for the sale of a player piano, in which the court held parol evidence admissible to prove that the contract was induced by fraudulent representations, notwithstanding such a clause limiting the authority of the selling agent. And this must be true, because otherwise such a condition would make it impossible to avoid any such sale, however fraudulent it might be.

In *Tiffany* v. *Times Square Automobile Co.,* 168 Mo. App. 729, 731, 154 S. W. 865, 866, where the contract contained the clause "It (the instrument) is the complete and entire contract between the parties and no representations, warranties, or conditions, other than those appearing hereon, will be binding upon either party," the court held that parol evidence was admissible to show fraud in the procurement of the written contract, saying: "The words of the contract have full force and application as to representations, warranties, and conditions culminating in a sale. But they do not mean that fraud should not be inquired into. One's written contract may be such as to show that fraud, as known to the law, has not been committed; but we think it would not be permissible for a party to make a binding contract that his fraud shall not be shown, any more than that it would that his crime should not be closed from view by the terms of the written paper."

Pertinent cases illustrating the principle could be multiplied, but we only note one other, because it involves the precise clause in question, and the plaintiff in error here. That is *White Sewing Machine* v. *Bullock,* 161 N. C. 1, 76 S. E. 634, where it is held that it constituted no bar in

that case to the defense that the contract had been induced by the falsehood and fraud of the same N. L. Massey in procuring the contract there involved.

The representatives of fifteen dealers who had purchased machines from the White Company under contracts made between February, 1909, and June, 1913, testified in this case. Their transactions were strikingly similar to this and to each other. In each case the purchaser had been induced to purchase the machines by representations alleged to be false and fraudulent, and all the transactions were entirely unsatisfactory in their results; and the methods of their agent, Massey, in inducing merchants to buy their machines, has been brought to the attention of the White Company so frequently as to leave no doubt that they were fully aware of his habitual unrighteous business methods. In this case neither Massey, who attended the trial, nor any other representative of the White Company, took the witness stand or controverted in the slightest degree the damaging facts which so clearly demonstrated the system of fraud of which the Gilmore Company in this case was made the victim.

[4] Of course, the false representation which is relied upon to escape the binding effect of a contract must be relied upon by the vendee at the time the contract is entered into, but when the vendor has made a false representation, which from its nature is likely to induce a buyer to enter into a contract on the faith of such representation, it will be inferred that the vendee was induced thereby to make the contract, and he is not required to show that he in fact relied upon the representation. If the seller wishes to discredit this natural inference, he must prove either that the buyer knew that the representation was false, that he expressly stated in terms, or showed by his conduct that he relied upon his own judgment and not upon the false representation. *Wilson* v. *Carpenter*, 91 Va. 183, 21 S. E. 243, 50 Am.

644 White S. Mach. Co. *v.* Gilmore Fur. Co., 128 Va. 630.

Opinion.

St. Rep. 824. In this case, however, it is unnecessary to rely upon that principle, because Gilmore testified definitely that upon concluding the conversation he told Massey that "he would undertake the distribution of the machines because of the representations he had made to us regarding their reselling plan."

We do not think it necessary to pursue this feature of the case any further, because it is perfectly apparent from the evidence that the allegations of the pleas that the contract was induced by the fraudulent representations of Massey, the agent of the White Company, are fully sustained. Upon the merits of the case there can be but one conclusion.

Taking up the certificates of exception and the specific objections to the procedure, we find this:

[5] (a) No. 1 relates to the testimony of Gilmore as to the occurrences which led up to the contract. There are fifteen of the questions and answers, and the certificate shows in general terms that counsel objected to the introduction of said evidence. This is entirely insufficient to sustain such an exception. The exceptor should designate the particular questions and answers his exception relates to, and, as has been said, this court will not endeavor, where some of the evidence is clearly admissible and some may be inadmissible, to discover the objectionable portions of the testimony. As to this exception, there is certainly much of the testimony which is clearly admissible, for it simply relates to the surrounding circumstances under which the contract was induced. ·

[6] From the briefs, however, we think we may fairly assume that the chief objection was to the introduction of the separate paper or guaranty signed by Massey, upon the ground that it was an effort to vary and contradict the written contract of sale, and we shall dispose of the exception under that assumption.

After having detailed the circumstances, including the

White S. Mach. Co. *v.* Gilmore Fur. Co., 128 Va. 630. 645

Opinion.

assurances and inducements which Massey had given in order to make the sale, the witness says this: "I noticed on that order that the plan of reselling was not carried out in the order and that the plan was not explained there, and I called Mr. Massey's attention to that, and I said, 'Mr. Massey, you have not entered on this order the plan that you have so vigorously outlined as your company's plan of distributing those machines,' and he said, 'that don't make any difference. This is the plan of the White Sewing Machine Company, but I will give you my personal guarantee that the plan so outlined to you will be carried out.' " Thereupon the personal guaranty hereinbefore quoted was executed. The trial court expressly declined to permit any contradiction of the written order of sale, and rejected the plea of the Gilmore Company which sought to engraft the contract of Massey upon the contract with the Gilmore Company, and thus sustained the view here again urged. The court did not permit the document to be introduced for the purpose of varying or contradicting the sales order. It was introduced as a part of the *res gestae*—the attending circumstances and conditions under which the Gilmore Company entered into the contract with the White Company. The paper did not purport to add any obligation to the contract of sale, and did not in fact do so. It imposed an independent obligation on Massey, but neither diminished nor enlarged the obligations of the White Company. Even if it were true that the court should not have admitted it, such action was harmless, because there is no reason to doubt that the jury clearly understood that it constituted no part of the contract with the White Company. So that no reversible error is shown by this certificate. It did not vary or contradict the written contract, but tended to sustain the allegations of fraud. 19 Ann. Cas. 546.

[7] (b). Certificates of Exceptions Nos. 2 and 3 may be considered together. Mr. Gilmore, who testified that he was

the president and general manager of the Gilmore Company, that he supervised the bookkeeping, and that he had the books of original entry in the court room, was permitted to introduce certain leaves of the loose leaf ledger of that company. These leaves purported to show all the receipts and expenditures in connection with this transaction, involved many items and a period of several years. The objection is to the introduction of these ledger leaves. The witness stated that the actual entries were made by a number of bookkeepers. He named two, both of whom lived in this State, and one was within the immediate jurisdiction of the trial court. The insistence is that these bookkeepers should have been introduced.

We have discussed this question in the case of *French* v. *Virginian Ry. Co.,* 121 Va. 383, 93 S. E. 585, and there held that notwithstanding the strictness of the original rule as to the proof necessary to authorize the introduction of books or summaries therefrom, a freight adjuster, who was an employee of a railway company would be allowed to testify that he had obtained the original train sheets from the proper custody, and that thus identified these train sheets were admissible as evidence. The insistence there was that such sheets could only be verified by the train dispatcher in whose office they were lodged. We have no reason to doubt the soundness of that decision, and for the reasons which are there stated, which we think it unnecessary here to repeat. It would indeed be a reflection upon the law to say that the president and general manager of the business of a corporation, could not identify the books of the corporation, for whose business in its details he was personally responsible as its general manager, and who testified in addition that he supervised its bookkeeping. The substance of the exception is that Gilmore occupying that relation to these books, could not identify them. Every other fact which is necessary for the introduction of the books appears,

or may be inferred. They were the regular books of the corporation, containing the financial record of its business with the entries made cotemporaneously with the transactions referred to. They came from the proper custody. There is thus every circumstantial guarantee of their genuineness, with the practical impossibility, on account of the inconvenience, of producing all of the witnesses who might have testified as to isolated transactions involved in the long account covering a period of three or four years.

[8] Closely related thereto is Exception No. 3, which arose thus: These ledger sheets (which are also referred to in exception No. 2) when introduced in many instances showed merely the dates and amounts of debit and credit, with references to the pages of the journal and cash book, and upon cross-examination by the counsel for the White Company, the witness testified that he could not tell to whom and for what many of the amounts referred to were paid out, but could only say that it was on the sewing machine account. He further testified, however, that he could take the folios of the cash book and the journal, and go back and find out. So on the next day he again produced the same ledger sheets, but in a blank space on the sheets he had in the interval entered the names of the parties and the purposes for which the several payments had been made, identifying the items as far as he could from having examined his cash book and journal. As thus amended the ledger sheets were admitted, and this action is also criticised, but the criticism is unjustified. The additions to the ledger sheets were made in order to give the court, jury and counsel such additional information as could be obtained from the books of original entry, which the attorney for the White Company had asked for and to which they were entitled.

[9] (c) Certificate No. 4 relates to the separate results of the work of each of the several salesmen of sewing machines. The witness had been asked whether he could show

the work of each salesman from his books, and he therefore made up some statements of the work of the various salesmen, showing the amounts collected and paid out on account of the work of each, and tendered them. The court properly admitted the statements and allowed him to testify with reference thereto, and this exception is without merit. The evidence was really introduced in response to the demand of counsel for the White Company on cross-examination, for further particulars.

[10] Each of these exceptions to the introduction of the ledger sheets and summaries therefrom, whatever difference of opinion there might be as to their introduction in the first place, become immaterial and of no consequence whatever in view of the fact that the witness brought the books of original entry into the court room, and they were formally tendered as evidence, so that counsel who questioned the verity of any of the items shown by these statements had the opportunity to examine the original books and to discredit them if they could have been discredited.

[11, 12] (d) The plaintiff in error excepted to instruction No. 5, which was given to the jury upon the motion of counsel for the Gilmore Company. This instruction reads thus:

"The court instructs the jury that the measure of damages for misrepresentation of the price at which machines of this kind and quality had been sold, is the difference between the price at which they had been sold and the price paid, and they shall find accordingly. The measure of damages for false representations regarding other sales and regarding the assembling of a corps of honest, trained and efficient salesmen, and regarding the honest purpose of Massey to carry out the agreement to furnish such men, is the difference between the value of such machines if such representations had been true and their value under actual conditions. This difference in value the jury shall determine and charge against the plaintiff."

The first paragraph of this instruction, while not as clear in its expressions as it should have been, could hardly have misled the jury. As we understand it, it in substance told them that the measure of damages for the misrepresentation of the price at which such machines as these had been sold to others, is the difference between such smaller price and the price fixed in the contract with the Gilmore Company. We think this part of the instruction substantially correct, and find no error therein. Then the second clause of the instruction clearly and sharply brings the true measure of damages to the attention of the jury, and shows, as is shown elsewhere in the record, that there is no reason to suppose that the jury failed to understand the true issue here involved. Gilmore had testified that if the representations as to the corps of honest, trained and efficient salesmen which were to be available to his company for the purpose of selling these machines had been true, at the expense at which Massey had represented they could be secured, then these machines could have been sold for the agreed sales price, $65 each, and that in view of the fact that all of these representations were false the machines were hardly worth $20 to his company on that market. The question, then, thus clearly referred to the jury by this instruction was, to determine the depreciated value of the machines by reason of the facts as they actually existed, in contrast with what their value would have been if the facts had been as represented by the White Company's agent. The only question which the evidence left undetermined was the amount of the actual damage or loss to the vendee resulting from the fraud and the instruction fairly and properly submits that to the jury.

[13, 14] (e) It is vigorously claimed (and this presents the most debatable question in this case) that the damages claimed by the Gilmore Company and allowed by the jury are remote and speculative. Upon the merits of this case

82

there is no doubt whatever in our minds of the right of the Gilmore Company to recover substantial damages. It is impossible, however, in cases of this sort, to prove with mathematical certainty the amount of such damages. Many considerations enter into such a determination. The Gilmore Company asserted and their witness testified that their damages were over $5,000, and this was based upon their claim that they had a right to rely upon every statement which Massey made, and if all of them had been true, their profit would have been realized. Some of these statements, however, were mere predictions. For instance, the estimate of what would be the expense of furnishing horses and buggies for these agents could not be relied upon as a guaranty that the expense would be no greater, for no one could foretell this with absolute accuracy; and so it is fairly to be inferred that there might be some losses from bad debts, because of failure of purchasers of machines to finish paying for them. These uncertainties, however, and others which may be suggested, cannot relieve the White Company of its obligation to respond to the claim for substantial damages. They introduced no testimony to aid in ascertaining the true and just amount, and cannot complain if the jury were left without such guidance as they could have afforded. That the jury refused to allow the uncertain profits which Gilmore testified that his company had a right to expect, is perfectly clear, for they only allowed $2,850, instead of $5,038.48 which the company claimed. The question was one peculiarly within the province of the jury, and while a litigant cannot escape his obligation to establish his damages with reasonable certainty by the best evidence which is available, still where it is manifest that he is entitled to substantial damages, and does the best he can to give the jury all of the information he possesses, he is not to be denied any recovery because he cannot demonstrate the amount of such damages with precision. Such uncer-

tainties will always be resolved against a vendor who seeks to profit by the fraud of his own agent. The Gilmore Company was induced to make this contract by the false and fraudulent representations of Massey, the agent of the White Company. They spent a great deal of time and money in endeavoring to make sale of these sewing machines, and all the available facts were given to the jury. The time which might have been devoted to its other considerable business interests was devoted to this particular venture, and the loss thereby occasioned, while uncertain in amount, is not speculative. The pecuniary damage has been substantial, the White Company is responsible therefor, and we find no sufficient reason for concluding that the amount allowed is excessive.

We are of opinion, therefore, to affirm the judgment.

*Affirmed.*