# Richmond

WASHINGTON GOLF AND COUNTRY CLUB, INC. v. BRIGGS AND BRENNAN DEVELOPERS, INC.

November 26, 1956.

Record No. 4591.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Cornelius H. Doherty*, for the appellant.

*Thomas G. Mays, Jr. (Harry W. Porter; Adams, Porter & Radigan*, on brief), for the appellee.

MILLER, J., delivered the opinion of the court.

The Washington Golf and Country Club, Inc., hereinafter called complainant, filed its bill against Briggs and Brennan Developers, Inc., hereinafter called defendant, in which it sought injunctive relief and damages. It charged that during early 1953, defendant, owner of a 17-acre tract of wooded land which adjoins complainant's golf course on the south undertook to develop its acreage and establish a subdivision known as Forest Hills, and in doing so changed the topography of the land, laid out roadways, installed drains and storm sewers, and by these means collected the surface water into artificial channels, diverted its natural flow, and discharged it in materially accumulated volume and accelerated flow, mingled with silt and debris, upon complainant's golf course. The prayer of the bill was that defendant be permanently restrained from causing, permitting or allowing the water and silt from the subdivision to flow in and upon complainant's property, for award of damages and general relief.

Defendant denied the material allegations of the bill, asserted that it had violated none of complainant's rights, and had caused no damage to complainant.

The evidence was heard *ore tenus*, and the chancellor viewed the area involved. In a brief written opinion he said that it was apparent that "much of the conditions of which" complainant complains "can be attributed to the respondent's conduct" and that the latter should be restrained. Though he stated that complainant had been damaged, yet he said that the evidence did not show "how much in dollars and cents that the damages amounted to" and the damage sustained "was not established with any degree of certainty" that would allow the court to fairly assess the same though he believed the damages "could be determined."

The final decree restrained defendant from "causing, permitting or allowing silt, mud or other foreign materials to wash from property owned by the defendant" upon complainant's property, but no award of damages was made. From that decree complainant appealed and assigned error. No cross-error was assigned by defendant.

During pendency of the suit, defendant, by virtue of § 15-792, Code 1950, dedicated all of the streets, gutters, drains, and storm sewers in the subdivision to the county of Arlington and disposed of all of its lots and land to others. When the final decree was entered, defendant owned no streets, storm sewers or land from which water, silt or debris could drain upon complainant's golf course and as the injunction merely restrained defendant from causing, permitting or allowing silt, mud or other foreign material to wash from property *owned* by it upon complainant's property, the injunction is ineffectual to prevent further damage to complainant. Yet by awarding injunctive relief, the final decree determined and established that defendant had violated complainant's rights and inflicted damage upon complainant by causing, permitting or allowing silt, mud, or other foreign material to wash upon its land.

In its assignments of error complainant asserted that the decree should have required defendant to remedy the condition and prevent further deposit of water, material and debris upon the golf course. As that was not done because defendant had disposed of all of its property during the pendency of the suit, it insists that complainant should have been awarded a monetary judgment for damages in a sum sufficient to install a storm sewer beginning at the edge of defendant's subdivision where the water and debris are cast upon the golf course and thence extending along a natural ditch or ravine through complainant's property. It insists that installation of this storm sewer is necessary to prevent further and continued damage. We are asked to assess and award a judgment for damages or remand the cause for assessment and award by the trial court.

Thus the question presented is whether or not the court should have awarded damages to complainant.

Recital in detail of the conflicting and voluminous evidence offered by the litigants to sustain their respective contentions would serve no good purpose. It is sufficient to say that it supports the conclusion that because of defendant's change of the topography of the subdivision area by making excavations and fills, laying out streets, and installing gutters and storm sewers, the surface water natural to that area and some that drains thereon from another improved area was accumulated in materially increased and detrimental volume. It also shows that the concentration of this water into two large storm sewers installed in the subdivision, one of which emptied

at complainant's property line, and the other of which emptied into a small branch on defendant's property not far from complainant's No. 11 green and fairway resulted in concentrating and materially accelerating the flow of surface water cast upon complainant's land. Intermingled with the increased and concentrated volume of water thus channeled to complainant's property were mud, silt, gravel, small stones and other debris which were washed into a water hazard near No. 11 green and also deposited at and around No. 11 green and over part of that fairway. This damaging concentration of water, carrying some objectionable debris, flows on thence beyond green No. 11 down a ditch or ravine that traverses the golf course from south to north.

During rainy weather other surface water natural to the golf course flows from low places thereon into this ditch or ravine and is there mingled with the water from defendant's subdivision. Before installation of defendant's storm sewers, there was some detrimental erosion along the course of this ditch or ravine that traverses the golf course. Now when there is considerable rainfall, the concentrated volume of water with accelerated flow deposited on complainant's land augments the flow of surface water and causes more erosion along the ditch or ravine traversing the golf course than was experienced before the subdivision was developed.

Bedford P. Canby, real estate agent, developer and contractor, and a member of the golf club, testified as to the condition on the golf course and especially as to that around green No. 11, and the cost to build a new green.

He said that before Forest Hills was developed, there was a small water hole hazard in front of No. 11 green and that No. 11 was a "very pleasant golf hole." He then said that due to the now excessive flow of water, erosion had set in on the little branch that supplied the water hole; the water hazard had filled "up with silt and mud" and had to be cleaned out and then abandoned by breaking its dam. Testifying further he stated that No. 11 green and fairway had been adversely affected by the concentrated discharge of water from the storm sewers; heavy gravel and silt had washed down to that area, and if it was allowed to continue, it would ruin No. 11 golf hole. The condition obtaining near and around that hole was thus described:

"It is just a morass down there; it is unclean; it has widened out and it is thick, heavy, black mud."

No. 11 green actually consists of two greens close together, both of which have been used for years, and in stating what it would cost to replace these greens at another location, if such could be arranged, which would be most difficult, he said:

"Well, the going rule for the construction of golf courses is $10,000 a hole. A hole on comparable land like that with two greens would certainly cost a minimum of $10,000 to reconstruct or reproduce."

W. W. McCollum, former chairman of the club's greens committee, in describing what happened to the water hazard near No. 11 green and the condition of that fairway after defendant installed its storm sewers, said:

"Beginning in 1953, that gradually began to fill up with debris, silt and gravel, whatever you want to call it.

\*     \*     \*     \*     \*     \*     \*

"Q. What would happen when this number 11 water hole was filled up with dirt and silt? Was there anything that could be done so far as a golf ball that would come off number 11 tee?

"A. It would bury itself and unless you wanted to wade out in that mud to recover it, you had a lost golf ball.

\*     \*     \*     \*     \*     \*     \*

"Prior to the development of Forest Hills there I did not notice any great amount of debris. After that pipe was put in there, and after a storm, there would be two or three inches of fresh wash down there, together with maybe rocks, three or four inches in diameter, and holes dug out of the fairway on down below; and it has washed out the place before the dam on innumerable occasions. We have filled that any number of times.

"Now, before that pipe was put there, that fairway could be mowed with a mower very easily, power mower. Today, and because of all those little stones and everything there, we don't dare run the mower in there.

\*     \*     \*     \*     \*     \*     \*

"If no preventive measures were taken, the eventual elimination of the hole itself would be the end result because the silt would

continue to pile up there. Your wash on the middle of the fairway, if uncontrolled would, as I see it, tend to make the hole unusable."

Charles W. Smith, a real estate broker and developer, and a member of the club for eighteen years, said that the accumulation of mud, sand and gravel in places around No. 11 green and on that fairway and erosion in other places of that area, covered by the water coming in on the course from Forest Hills would require the elimination of No. 11 hole unless corrective measures can be taken to control the water. He then testified as to the cost to build another green in place of No. 11, if that could be accomplished, and said:

"Some years ago we found that it cost us $5,000 to build a green on good terrain. But on this property here, where it is subject to being undermined and where it is partly built out, I would say that if we could get out under $7,500 after a foundation is provided we would be lucky. This would, I think, cost $7,500 for each green."

Wesley McDonald, a witness for defendant, testified on cross-examination as follows:

"Q. Will you describe the type of water hole we had there prior to this time?

"A. Well, from the time that I first joined the club, in '42, we had a very attractive water hole, in my opinion. In recent years, the water hole has been done away with; there has been this filling up and piling up of this obnoxious smelling silt until now it is just a very unsightly disagreeable and from a golf standpoint and in the vernacular, a very nasty hole."

Complainant offered much evidence to prove that it would cost about $45,000 to install a storm sewer from defendant's line northwardly along the ravine through complainant's property. This would accommodate all water and debris coming from the subdivision, all surface water originating on complainant's golf course, prevent the accumulation of debris on complainant's property and eliminate erosion along the ravine traversing the golf grounds from south to north.

The chancellor disallowed complainant's claim for damages to install such a storm sewer. His opinion indicates that he did not think that the evidence showed what part of the damage was caused by defendant or what proportion of the cost of installation of the sewer was properly chargeable to defendant, and he con-

cluded that the cost of the sewer was not the proper measure of damage.

We need not weigh and analyze the evidence to determine whether or not under principles heretofore announced defendant violated complainant's rights and inflicted damage that justified injunctive relief. *Norfolk & Western R. Co.* v. *Carter*, 91 Va. 587, 22 S. E. 517; *Third Buckingham Community, Inc., et al.* v. *Anderson*, 178 Va. 478, 17 S. E. 2d 433; *Howlett* v. *City of South Norfolk*, 193 Va. 564, 69 S. E. 2d 346; *Mason, et al.* v. *Lamb*, 189 Va. 348, 53 S. E. 2d 7; *Hodges Manor Corp., etc.* v. *Mayflower Park Corp.*, 197 Va. 344, 89 S. E. 2d 59. That issue has been put at rest by the final decree though the specific relief granted is ineffectual because defendant dedicated its streets and drainage system and disposed of its property pending the cause.

■ Now we need only determine whether or not the proof is sufficiently certain to warrant a finding and assessment of consequential damages.

"Damages are not rendered uncertain because they cannot be calculated with absolute exactness or because the consequences of the wrong are not precisely definite in pecuniary amount. Moreover, one whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by a plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. An element of uncertainty in the assessment of damages or the fact that they cannot be calculated with mathematical accuracy or with reasonable certainty or exactness is not a bar to their recovery. Nor is mere difficulty in the assessment of damages a sufficient reason for refusing them where the right to them has been established." 15 Am. Jur., Damages, § 21, p. 412. 15 Am. Jur., Damages, § 356, p. 795.

"Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded." 5 M. J., Damages, § 13, p. 501. 5 M. J., Damages, § 19, p. 5.07. *White Sewing Machine Co.* v. *Gilmore Furniture Co.*, 128 Va. 630, 105 S. E. 134.

■ The chancellor was correct when he disallowed recovery of damages to install a storm sewer across complainant's property. The evidence failed to show with any reasonable certainty what proportion or part of the erosion of the property along the ravine banks was caused by the increased flow of water attributable to defend-

ant's wrongful conduct. Nor was any evidence offered to show depreciation in the value of complainant's property caused by the increased erosion in the ravine brought on by the concentrated and accelerated flow of water and debris.

However, the evidence pertaining to the debris deposited around green No. 11, the damage done to the water hazard and that green, the necessity for its abandonment and the cost of replacing the green, though it be located at a less desirable spot is much more certain and specific. Abandonment of the water hazard has already been made necessary, and the evidence is sufficient to find that the green must be moved or abandoned because of the continued and progressive accumulation of mud, silt, stones and debris around and near thereto. The storm sewers are of permanent construction and the deposit of water, silt and debris on this particular area of the golf course will continue. The condition created by defendant's wrongful and actionable conduct constitutes a permanent injury to this part of the golf course. Abandonment of green No. 11 without replacement elsewhere would be most detrimental to the value of complainant's property interest, if not destructive of the golf course. The costs that would have to be incurred to locate and construct a green at another place removed from the direct damaging effect of water and debris now accumumulating around it is shown to be from $5,000 to $7,500 for a single green. The evidence is sufficient to sustain a finding that replacement of this green is reasonably necessary, and the cost to replace it is likewise proved within sufficiently certain limits to admit of computation and assessment.

Other damage caused to complainant's property is not shown by the present record with that degree of certainty that admits of calculation or ascertainment, though some additional damage may be attributable to defendant's wrongful conduct.

The decree must be reversed for failure to award a judgment for the proved damages, but the facts before us do not enable us to enter a final decree that would "attain the ends of justice." Section 8-493, Code 1950; *Latham* v. *Powell*, 127 Va. 382, 103 S. E. 638; *Greer* v. *Doriot*, 137 Va. 589, 120 S. E. 291; 7 M. J., Equity, § 156.

The evidence is voluminous and conflicting, and different inferences might be reasonably drawn from some of the proved facts. A jury is better able than the court to weigh the evidence and determine what damages have been caused to plaintiff by defendant's

wrongful conduct. 7 M. J., Equity, § 155. Yet we may not transfer the cause to the law side of the court simply because the evidence is conflicting for § 8-138, Code 1950, permits the transfer only when the case is *brought* on the wrong side of the court, and this suit was brought on the proper side. *French* v. *Stange Mining Co.*, 133 Va. 602, 114 S. E. 121; *Conway* v. *American National Bank*, 146 Va. 357, 131 S. E. 803; Burk's Pleading and Practice, 4th ed., § 212, p. 349.

The decree appealed from will be reversed insofar as it disallows recovery of any damages. The cause will be remanded to the trial court for a new trial limited to the issue of damages, and with directions to order an issue out of chancery and impanel a jury to determine the quantum of damages that complainant is entitled to recover. § 8-212 and § 8-214, Code 1950; 7 M. J., Equity, § 156; Burk's Pleading and Practice, 4th ed., § 428, p. 847.

*Reversed in part, and remanded.*