## Richmond

### WILLIAM S. MUNDY, III, ET AL. v. LAWRENCE A. HESSON, ET AL.

December 2, 1974.

Record No. 730947.

Present, All the Justices.

*Lawrence Janow,* for appellants.

*Wm. Rosenberger, Jr. (J. B. Wyckoff; Richard E. Spies,* on brief) for appellees.

Compton, J., delivered the opinion of the court.

This appeal reviews the trial court's denial of the purchasers' request for specific performance of a contract for the sale of real estate which came into existence by the exercise of an option to purchase.

The plaintiffs, William S. Mundy, III, and Patricia W. Mundy, his wife, alleged in their bill in equity that they properly exercised an option agreement for the purchase of two tracts of land in Amherst County, Virginia, from the defendants, Lawrence A. Hesson and Martha T. Hesson, his wife. The Mundys asserted that by their acceptance of the option, a valid and enforceable contract of sale was created, that they have been willing and ready to perform the contract, that the sellers have

refused to comply with the option agreement and sales contract, and, therefore, that they are entitled to have the agreement specifically enforced.

In their answer, the defendants admitted the granting of the option, denied that the plaintiffs properly exercised the option, and denied that the plaintiffs were able or ready or willing to pay the purchase price according to the terms of the agreement.

After hearing the evidence *ore tenus*, the chancellor, in a written opinion, found in favor of the defendants, and we granted the purchasers an appeal from the final decree which denied specific performance.

Mundy, an attorney at law and a member of the bar since 1968, had been personally acquainted with the Hessons "for a long time" and familiar with the property since he had hunted over "every other foot" of the larger tract for about twenty years. Several days prior to the execution of the option in question, Mundy went to see Hesson at his store in Riverville, Virginia, and asked Hesson if he would sell the Ranch Tract consisting of 842 acres. Hesson refused to sell the Ranch without selling the store property, a separate parcel of about three acres. Even though Mundy was not interested in the store which Hesson said had $4,000 worth of goods in it, he nevertheless agreed to include it in the option. The price set was $75,000 for the Ranch and $16,000 for the store and its stock of goods.

Mundy drew the option and in several days returned with his wife to Hesson's store where the agreement was executed by the Hessons on July 24, 1972. After handwritten changes in the typed draft were made at Hesson's request, the option provided:

## "O P T I O N

"We, the undersigned, hereinafter referred to as Grantors, in consideration of Ten Dollars ($10.00), receipt of which is hereby acknowledged do hereby sell, give and grant unto William S. Mundy, III, and Patricia W. Mundy, Grantees, the exclusive right and option to purchase that certain property owned by the Grantors in Court House Magisterial District, Amherst County, Virginia, and more particularly described as follows:

4
852 acres, more or less, and known as the Ranch Tract lying between Riverville and Amherst, Virginia, and a 3-acre

tract at Riverville being better known as Hesson's store and all appurtenances and privileges thereunto belonging

at and for the price of Ninety-one Thousand Dollars ($91,000).

This option shall remain in effect for a period of ~~six (6)~~ 60 days ~~months~~ from the date thereof, during which time the Grantees may exercise this option.

"Said option if exercised will include the stock of trade in Hesson's Store, valued at approximately $4,000, and all fixtures and other store equipment necessary to the operation of said store and now located on the said premises including but not limited to scales, coolers, ~~&~~ freezers ~~and Jeep truck. Should the option be exercised it will include also all of the logging equipment now in the possession of the Grantors including but not limited to trucks, saws and crawler tractors~~.

"Grantors agree that the Grantees may enter upon the property to inspect or to test the soil or other conditions at any time during the term of this option. Should Grantees exercise this option, the consideration mentioned above shall be credited against the purchase price specified for the property. In the event that the Grantees exercise this option the Grantors agree to deliver unto the Grantees a General Warranty Deed. In the event that the option is exercised the Grantors agree to allow Grantees a reasonable time to have Title examined and should any defects be found Grantors agree to remedy them within a reasonable period of time.

"WITNESS the following signatures and seals this 24th day of July, 1972."

When requiring the change from six months to sixty days, Hesson told Mundy that he "wouldn't sign the place up for no six months, [he] would give him sixty days and that was all." Nothing was discussed about the manner and method of payment of the purchase price. Mundy represented to Hesson that his father-in-law, a nonresident, "had plenty of money" and that "he could get all he wanted," so Hesson, contemplating a cash transaction, made no inquiry of Mundy on that subject.

On September 12, 1972, Mundy wrote the Hessons as follows:

"Dear Mr. & Mrs. Hesson:

"This is to notify you that William S. Mundy, III and Patricia W. Mundy wish to exercise their option to purchase that

certain property owned by you and described in an OPTION dated July 24, 1972. Said property is 842 acres and Hesson's Store.

"Please get in touch with the undersigned to set up a date to go over the mechanics of the transfer. A copy of your Deed is also necessary so that a Title Search may be made prior to closing."

On September 19, 1972, Hesson went alone to Mundy's office to "settle up with him." Hesson stated he was ready to perform on that day by delivery of the executed deeds to the property, although the deeds had not been prepared. He had the old deeds conveying the property to him under the seat of his car parked outside Mundy's office. Hesson testified that he could have had the deeds prepared in an hour if Mundy had been ready to pay the $91,000. He further stated that "I asked him about the 91,000 and he said all he could scrape up then was $20,000.00. So I told him that 'no deal' on $20,000 . . . He wanted to pay me 20,000 and I would deed the places to him and I wouldn't agree to that at all." Hesson then left Mundy's office and there was no communication between the parties for more than two months thereafter.

During August of 1972, rumors had begun to circulate in the area about industrial development being planned for the Riverville area, although Hesson testified that "nobody actually knew anything [definite about the plans] until sometime in December."

During the Fall of 1972, Hesson, considering the transaction ended, continued to cut pulpwood from the property, continued to sell merchandise from the store and in October granted another option to a third party on the store property which was never exercised.

On December 5, Mundy mailed Hesson, without a cover letter, drafts of deeds to the property in question prepared by another attorney who had examined the title at Mundy's request. Mundy admitted that he then knew "the plant was coming in."

On December 14, 1972, Hesson wrote Mundy:

"Dear Stark,

"I received two deeds from you. Your option terminated as of September 24th, 1972. I don't know where you got the authority to draw up these deeds. Therefore, I am returning them."

On December 15, 1972, Mundy replied by letter stating:

"Dear Mr. Hesson:

"By letter dated September 12, 1972, and received by you, I exercised the option on the land in question. I am sure that you will remember telling me that you talked to your Accountant shortly after the option was exercised in order to find out what were the best terms for you taxwise.

"The option called for the delivery to me by you of a General Warranty Deed to the property in question. As no Deed was so delivered I had the title checked without the copies and had the Deeds drawn up to save you some trouble.

"I am today recording the option and the copy of the letter exercising it. I am beginning to see that the request by you for payment in full as of settlement day was basically something to scare me off. I would still suggest that you take payments over a period of years in order to reduce your tax liability."

Hesson made no response to this letter and Mundy wrote again on December 20, 1972 as follows:

"Dear Mr. Hesson:

"I am still amazed and upset every time I happen to run across your last letter. I hope that I conveyed to you the idea in my reply to you that I expect to have the land transferred to me.

"As you had failed to comply with the terms of the real estate option by presenting me a Deed or a copy of a Deed to the land in question, so that I could have the title searched, I went ahead and had the Deeds that I sent you drawn up. I was not trying to usurp your authority; only trying to save you some trouble.

"I intend to have the real estate described in the option conveyed to myself and Pat. I would suggest that if you think the option and the letter that I sent you are not legally binding upon you and your wife that you take them to an Attorney for his opinion. I would not wait until the last minute to do it. I expect to have in my hands no later than December 30, 1972, properly drawn and executed Deeds to the property described in the option. I will be more than happy to send you the ones that you returned to me. I will also be happy to arrange the payment for the land in whatever fashion would best suit your personal taste or tax needs.

"By the letter dated September 12, 1972, the option was exercised. I can only hope that you will do what your heart says is right and transfer the land under the option. If your pocketbook wins the battle I will be forced to make you transfer the land."

Nothing was done thereafter by any of the parties to complete the transaction and this suit was filed on January 19, 1973.

The two main issues raised by the assignments of error are: did the trial court err in ruling that the option agreement was incomplete and uncertain because all of the essential terms of the contract were not finally and definitely settled; and, if a valid executory contract for the sale of the real estate was created, did the trial court err in denying specific performance for the reason that the plaintiffs were not able, ready, prompt, eager and willing to perform the contract.

We will assume the plaintiffs are correct in their contention that the option agreement was valid and that it was converted by the letter of September 12, 1972, into a binding executory contract providing for payment of the purchase price in cash within a reasonable time after September 12. The question remains, however, whether the plaintiffs are entitled to have the contract specifically enforced. We conclude they are not, and the trial court properly so held. "In order for a litigant to avail himself of the remedy of specific performance, 'he must show that he has been able, ready, prompt, eager and willing to perform the contract on his part. He must not have remained quiet or held himself aloof so as to enforce or abandon the contract as events might prove advantageous.' " *Reutt* v. *Jordan*, 207 Va. 869, 873, 153 S.E.2d 197, 200 (1967).

The plaintiffs contend they presented sufficient and compelling proof to show their ability, readiness and eagerness to perform the contract. But there were direct conflicts in the evidence on these essential elements. For example, Mundy testified that at all material stages of the transaction he had the *ability* and was *ready* to pay $91,000 in cash, because his father-in-law had made a commitment to him to advance the purchase price. Hesson, on the other hand, testified that on September 19 Mundy told him that all he could "scrape up" was $20,000 cash, stating that he did not want to seek additional funds from his father-in-law because of a prior indebtedness to him. The father-in-law did not testify nor was there any

evidence that funds to cover the purchase price were deposited to Mundy's account; nor was any escrow deposit made for the Hessons' benefit. Mundy seeks to excuse his delay in performance by saying that Hesson told him on September 19 that he would "get back in touch with me after he talked to his accountant" to decide on the income tax implications of an installment sale. Hesson says, however, that he never considered an installment sale because several years before he had investigated such an arrangement and decided then it would not be beneficial.

While the Mundys were obviously *eager* to perform because on September 21, 1972, they contracted to sell the larger tract for $132,000 to Clayton C. Bryant and Charles D. Branch, nevertheless the record conclusively shows that at no time from September 19 to the date this suit was filed did the plaintiffs ever make an unequivocal tender of payment in cash to the Hessons or ever state to the Hessons that they were ready to close the transaction with a cash payment. Nothing was specifically said in the letter of September 12 about payment. The letter of December 15 suggests an installment sale. The December 20 letter refers to payment "in whatever fashion would best suit your personal taste or tax needs" — a nonspecific and vague reference to a possible cash payment. This was made even after the August rumors of industrial development and attendant increased land value had ripened into a known fact.

The decree of the chancellor determining questions of fact on conflicting evidence heard *ore tenus* has the same weight as the verdict of a jury, and it will be permitted to stand unless plainly wrong or without evidence to support it. *Crowder* v. *Commonwealth*, 202 Va. 871, 875-876, 121 S.E.2d 487, 490 (1961). From a review of this entire record, the trial court's decision that the plaintiffs were not able, ready, prompt, eager and willing to pay the purchase price in cash within a reasonable time after September 12, 1972, is not plainly wrong or without evidence to support it.

The decree denying specific performance is therefore

*Affirmed.*

Harrison, J., dissenting.

I would reverse and decree specific performance.

The option executed by the Mundys and the Hessons was valid, and the Mundys made a bona fide acceptance of it within the time prescribed. It thereby became an executory contract for the sale of the property and enforceable by either party. The option did not require that within the sixty-day option period the deed from the sellers be executed and tendered, the title examined and the purchase money paid. It contemplated that the parties have a reasonable time thereafter in which to perform the respective acts required to close the transaction.

On September 19, 1972, a week after the Mundys notified the sellers they would exercise their option, Hesson testified that he went alone to Mundy's office to "settle up with him". The evidence is overwhelming that the purpose of this visit was not in fact to close the transaction, or even to work out the details necessary and incident to such closing. Clearly it was preliminary to a repudiation of the contract by the sellers. Hesson said that when he left home his wife told him "to bring back 91,000 if he wanted her to sign the deeds". Accordingly Hesson walked into Mundy's office and demanded the immediate payment to him in cash of $91,000. He testified: "The option called for $91,000 and I told him [Mundy] that was what I came for and he didn't have it." Hesson further testified: "I told him the deal was off unless he had the $91,000."

Hesson was not prepared to execute a deed to Mundy when he went to the latter's office on September 19th. His wife did not accompany him. He had not engaged a lawyer to write the deed. And he did not bring his old deeds with him to the office. He said they were under the seat of his car. When asked why he left them there, he replied: "Well, I wanted to see what he was going to have to say. There was a dozen or more people tried to buy my place and didn't have the money and I didn't sell it." When reminded that he had agreed to sell to the Mundys he answered revealingly: "I didn't let that one go, either."

From that day Hesson never communicated again with Mundy in person or in writing. He made no further effort to comply with his contract with Mundy, and on December 14, 1972, he returned the two deeds that Mundy sent him, with the observation: "Your option terminated as of September 24, 1972."

Conclusive that Hesson terminated and repudiated the contract on September 19, 1972, is the fact that thereafter he dealt with his property with complete disregard of his contract

with the Mundys. Within about thirty days thereafter, in October, 1972, he granted another option to a third party covering a portion of the land he was under contract to sell the Mundys.

There had been no undue delay on the part of the Mundys after exercising their option to purchase. Shortly thereafter they employed Richard M. Livingston, an attorney, to examine the title to the Hesson property. The title was examined by this attorney as soon as he reasonably could do so. The Hessons never submitted a copy of the deed they agreed to execute. Mundy, thinking that possibly the sellers expected him to prepare the deeds, had Mr. Livingston prepare them, and they were mailed to Hesson. It was these deeds that were returned by Hesson on December 14, 1972.

Thereafter, and prior to bringing a suit for specific performance, Mundy tried to close the transaction with Hesson, offering to pay for the land in any manner that Hesson desired, or that suited his tax needs. The suit for specific performance was filed approximately four months from the time the option was exercised. Considering the nature and size of the transaction, there was no delay on Mundy's part. *See Crowder* v. *Commonwealth*, 202 Va. 871, 121 S. E. 2d 487 (1961).

The sole ground assigned for denying the Mundys' specific performance is that they have not shown that they were able, ready, prompt, eager and willing to perform the contract on their part. It is with this holding that I disagree.

There was credible evidence that the Mundys had made arrangements to finance their purchase from the Hessons. Mr. Mundy, a practicing attorney with offices in Monroe, Virginia, and his wife so testified, and there was corroboration. It is inconceivable that Mundy was not ready, willing and anxious to close the transaction. On September 21, 1972, he entered into an agreement to sell a portion of the property covered by the option for $132,000 cash, and a $5,000 cash deposit was made to his real estate agent. While Mundy may have had only $20,000 readily available on September 19, 1972, this was no proof that he could not raise $91,000 within a reasonable time thereafter and upon tender of a deed by the Hessons. On the contrary, a prospective borrower needing $91,000 to close a transaction, who had $20,000 in cash and a tract of land having an established market value of $132,000, would be welcomed by any financial institution in the business of making loans.

Further, Mundy should not be penalized for advising Hesson of a way in which the transaction could be handled to result in a tax savings. Overlooked is the fact that, prior to Hesson's disenchantment with the option he gave, there was no occasion for these parties to deal with each other at arm's length. They had long been personal friends and Mundy had performed legal services for Hesson.

Notwithstanding Mundy was ready, willing and able to comply with his contract, and did attempt to close the transaction, a tender of the purchase money by him to Hesson was not necessary in view of the actions of the sellers.

"If the defendant puts himself in an attitude of default, resists the performance, and insists that he is not bound by the contract, tender to him is unnecessary. It could serve no purpose so far as he is concerned and would be mere formality. Equity does not insist on purposeless conduct, and disregards mere formalities. Consequently, all that is required in such case is that the plaintiff place himself in favor with the court, and this may be done by a proper offer in the pleadings." 71 Am. Jur. 2d *Specific Performance* § 66, p. 95.

When Hesson walked out of Mundy's office on September 19, 1972, he thought he had terminated the whole transaction. His subsequent course of action was consistent with this belief. He never had a deed prepared, or offered to convey the property with general warranty. Had he believed or even suspected that the Mundys were unwilling or unable to pay him $91,000 in cash, he only had to allow them a reasonable time for the title examination, then tender the purchasers a deed and demand settlement on a day definite. This would have put the Mundys "on their mettle". But this Hesson did not do. Instead he promptly gave another party an option and then sat back and awaited a law suit. This contrasted with the affirmative actions of Mundy looking toward the closing of the purchase.

*White v. Dobson, et al.*, 58 Va. (17 Gratt.) 262 (1867), was a suit for specific performance of a contract for the sale of land. White alleged that Dobson, without reason, refused to comply with his agreement to sell. Dobson denied the allegation, alleging, among other things, that White had wholly failed to do and perform his obligations under the contract, and having so failed, Dobson insisted that he was absolved from it. The court, speaking through Judge Joynes, said:

"The court is of opinion that there is no sufficient evidence that the appellant, before the filing of his bill in this case, received notice, as alleged in the answer of the appellee William Dobson, of the willingness of the said appellee to fulfill on his part, the contract in the bill mentioned. And as the said appellee had notified the appellant of his intention not to fulfill the said contract, the court is further of opinion that the appellant was entitled to file his bill for a specific execution of the said contract without making a tender to the said appellee of the securities provided for therein; and that therefore the decree of the Circuit court dismissing the bill of the appellant is erroneous. . . ." 58 Va. (17 Gratt.) at 265.

See also *Major* v. *Price,* 196 Va. 526, 84 S. E. 2d 445 (1954); *Wolford* v. *Jackson,* 123 Va. 280, 96 S. E. 237 (1918); *Matney* v. *Barnes,* 116 Va. 713, 82 S. E. 801 (1914); and *Nyder* v. *Champlin,* 401 Ill. 317, 81 N. E. 2d 923 (1948).

*Bateman* v. *Hopkins,* 157 N. C. 369, 373, 73 S. E. 133, 135 (1911), is a case in point. The court there quoted from *Pomeroy on Contracts,* § 1407, as follows:

" 'The doctrine is fundamental that either of the parties seeking a specific performance against the other must show, as a condition precedent to his obtaining the remedy, that he has done or offered to do, or is then ready and willing to do, all the essential and material acts required of him by the agreement at the time of commencing the suit, and also that he is ready and willing to do all such acts as shall be required of him in the specific execution of the contract according to its terms.' "

The court then, addressing itself to the facts in the case it was considering, said:

"But in this case the tender of the money was waived by the defendant, and the jury have found that the plaintiff was ready, able, and willing to comply with his part of the contract. *If he was not, in the sense that he did not have the money under his control and within his reach, so that he could put his hands on it and pay it over to the defendant at any moment, the defendant has not put him in default by tendering a deed for the land, thus 'cutting off plaintiff's right to treat the contract as still existing,' as said above.* How can the defendant be hurt, in that respect, by the judgment of the

court? The payment of the money is assured, for the plaintiff must pay it into court before he is entitled to receive the deed." (Italics supplied)

In the *Bateman* case the court further said:

"The following are special rules upon the subject, which seem to be settled: '(1) An actual tender by the plaintiff is unnecessary when, from the acts of the defendant or from the situation of the property, it would be wholly nugatory. Thus, if defendant has openly refused to perform, the plaintiff need not make a tender or demand; it is enough that he is ready and willing and offers to perform in his pleading. [Citing numerous cases including *White* v. *Dobson, supra.*] (2) Where the stipulations are mutual and dependent — that is, where the deed is to be delivered upon the payment of the price — an actual tender and demand by one party is necessary to put the other in default, and to cut off *his* right to treat the contract as still subsisting. . . .' " 157 N. C. at 372-73, 73 S. E. at 134, 135.

In the instant case the conditions of the option were mutual and dependent. There was to be no payment of purchase money by the buyers without the delivery of an executed deed by the sellers. Therefore, if Hesson desired to cut off Mundy's right to treat the contract as still subsisting, Hesson was under obligation to tender a good and sufficient deed with general warranty of title after having allowed Mundy a reasonable time for title examination.

Manifestly Hesson's actions on September 19, 1972 did not constitute a compliance with the terms of the option. No reasonable man would normally expect another to have $91,000 cash in his office, or even readily available; or that any purchaser of real estate would surrender $91,000 without a title examination and without being in receipt of a good, valid and sufficient deed from the sellers. However, it has been Hesson's position throughout this case that he should have been paid $91,000 in cash during the sixty-day option period, and that since he was not paid in cash, and upon his demand, then the "deal was off". His position was that he was absolved from any responsibility or obligation to the buyers following his confrontation with Mr. Mundy on September 19th. This being true, and having done nothing on his own part to comply with his agreement to sell, he is not entitled, in a court of equity, to

argue that Mundy was not ready, willing and able to comply with his part of the contract.

Paraphrasing *Bateman* v. *Hopkins*, *supra*, if the ability of the Mundys to pay is the issue, how can the Hessons be hurt by a decree of specific performance? The payment of the money is assured for the Mundys must pay it into court before they are entitled to a deed from the Hessons, or from a special commissioner in their behalf.

I'Anson, C.J., and Cochran, J., join in this dissent.