# Richmond

PATRICK O. MCCAULEY, ET AL. v. FORREST A. PHILLIPS, ET AL.

December 1, 1975.

Record No. 740840.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Paul M. Peatross, Jr. (Michael & Dent, Ltd.,* on brief), for appellants.

*George Gilmer, Sr. (Gilmer & Dezio,* on brief), for appellees.

COCHRAN, J., delivered the opinion of the court.

In January, 1972, Patrick O. McCauley and Thyrza Brooking Mc-Cauley, his wife, filed their bill of complaint in the trial court seeking to enjoin Forrest A. Phillips and Raymond Phillips from channeling surface water through a discharge pipe onto the McCauleys' land and to recover $2,500 for damages alleged to have been suffered. After a hearing on April 18, 1972, the chancellor, by final decree entered on May 8, 1974, denied the injunction on the ground that there was no evidence of substantial damage to the McCauley property. In this appeal the McCauleys contend that the chancellor erred in not awarding them injunctive relief and damages.

The evidence shows that the McCauley lot, containing approximately one and one-half acres, was located north of Charlottesville in Albemarle County, generally to the west and southwest of the Phillips property. In the area of the drainage problem the two tracts were separated by land owned by East Coast Oil Corporation. The Phillips land and nearby properties naturally sloped toward the McCauley property.

The McCauleys acquired their land in 1958 and built thereon their home, in which they lived with their two children. The Phillipses, who purchased one tract in 1964, thereafter acquired additional contiguous land. They erected buildings and graded and hard-surfaced a portion of their property to facilitate the operation and expansion of their building supply business.

McCauley testified that there was never any "mass amount" of water moving across his land from the uphill lands until 1968, when the Phillipses installed a drainage pipe eight inches in diameter on the southwest portion of their property. Since that time, however, whenever the area experienced rainfall of normal intensity, water from the Phillips land flowed across the East Coast parcel and flooded a part of the McCauley tract. McCauley testified that the water, varying from six to twenty feet in width and three to eight inches in depth, had killed the McCauleys' grass in spots, washed out two rows of their garden and a culvert under a creek, destroyed an apple tree, and eroded dirt under a gate. The ground in the path of the stream had become so soggy that his children could no longer play there. Moreover, the water flowed over the end of his septic field, requiring him to have the septic tank pumped for the first time. McCauley further testified that because of his efforts in reseeding grass and replacing fill dirt there was little evidence of damage to his land.

McCauley's wife and brother-in-law substantially corroborated his testimony. Moreover, photographs introduced into evidence

showed water flowing across or standing on the McCauley lot after rainfalls.

The Phillipses, in their testimony, maintained that the surface water had always flowed toward the southern portion of their property and across the intervening tract to the McCauley land. They admitted that in 1968 they installed a drainage system to channel water around the buildings erected on the northern portion of their property, and that they installed a pipe to drain approximately 19,000 square feet of their total area of 121,000 square feet. Only two building gutters emptied into the pipe. The mouth of the drainpipe was located within a few feet of what had been the lowest part of their property before they graded it. To diffuse the water and slow it down they placed railroad ties, planks and rocks at the mouth of the pipe on their property, with the result that no trace of erosion could be seen in that area. They further testified that other surface water, which did not run through the drainpipe, flowed onto the McCauley lot from the Phillips land and from other nearby properties. The unpaved portion of the Phillips lot continued to absorb surface water.

J. Whitt, a real estate broker and mechanical engineer, testified that it would be impossible for the 8-inch pipe to discharge enough water to create a stream fifteen feet wide and six inches deep; that if the McCauleys' septic tank had been properly installed it would not have been damaged by the flow of water from the Phillips land; and that he usually pumped out septic tanks every five or six years. Amon Williams, a building contractor, testified that few septic tanks in Albemarle County were used for ten years without being pumped.

Whitt, Williams, and other witnesses for the Phillipses testified that they could see no evidence of damage to the McCauley lot from surface water. The Phillipses also introduced into evidence numerous photographs of the drainage area that tended to support their position that the McCauley lot was not damaged by the water.

After hearing the evidence *ore tenus* and viewing the McCauley, Phillips and nearby properties, the chancellor made certain preliminary findings of fact. He noted that the area was undergoing a transition from rural use to business and commercial development, and that, through zoning, economic activity such as that engaged in by the Phillipses was being encouraged while residential use was being "phased out". He found that the McCauleys suffered extensive flooding after heavy rains but "there is not substantial evidence of any destructive force here. The Court [finds] that a considerable

inconvenience and temporary damage is inflicted by that flooding. . . . The only evidence of any destructiveness is that of the removal of the soil . . . but the major impact on the McCauley property is that of the saturation of the soil itself . . . from the surface water flowing". He also found that the Phillipses had not used their land negligently or carelessly, and that they had not maliciously discharged water on the McCauley lot. He expressed the belief that "McCauley's damages would be just as great if the court [enjoined use of the pipe] because the surface water would . . . eventually wind up in the same area. The thing that seem to me to be the basis of the problem is the changing of the surface of the Phillips property so that the water is not absorbe[d], it's got to go somewhere and will eventually wind up on Mr. McCauley".

In the final decree the chancellor included additional findings of fact. The decree stated that he found no silting or erosion at the mouth of the drainpipe or elsewhere, except for a "little erosion" where the water flowed under a gate on the McCauley property, at least 500 feet from the Phillips land; that the Phillipses had graded their land, erected buildings and blacktopped the surface, thereby increasing the flow of surface water after rains; that the Phillipses had done nothing to increase the area naturally drained; that they had placed "large rocks and pieces of concrete" at the end of the pipe "to diffuse and disperse the water"; that the water flowed across the McCauley land in "no defined bed"; and that there was no evidence of substantial damages to the McCauleys. Finding evidence of "potential damage", however, the chancellor decreed that if the Mc-Cauleys, or their successors in title, should construct an underground conduit to carry off the water, they would have an easement to connect with the Phillips discharge pipe, and the cost of installing and maintaining the conduit should be borne equally by the owners of the McCauley and Phillips lands.

■ We have recently had occasion in *Seventeen, Inc.* v. *Pilot Life*, 215 Va. 74, 205 S.E.2d 648 (1974), to review and reaffirm the principles applicable in surface water drainage cases. Under the modified common law rule surface water is a common enemy which each landowner may fend off, provided he does so reasonably and in good faith and not wantonly, unnecessarily or carelessly. Thus, a landowner may, in the reasonable development of his property, grade it, *Mason* v. *Lamb*, 189 Va. 348, 53 S.E.2d 7 (1949), or construct a building thereon, *Motor Company* v. *Furn. Co.*, 151 Va. 125, 144

S.E. 414 (1928), without becoming liable for the discharge of additional diffused surface water resulting from such improvements.

■ Under an exception to the modified common law rule, however, we have held that a landowner may not collect surface water into an artificial channel and discharge it in concentrated form upon the land of another to his injury. *Hodges Manor Corp.* v. *Mayflower Corp.*, 197 Va. 344, 346-47, 89 S.E.2d 59, 61 (1955); *Third Buckingham, Etc.* v. *Anderson*, 178 Va. 478, 484-87, 17 S.E.2d 433, 435-36 (1941). A lower landowner who establishes that he has been damaged by his neighbor's violation of the exception may be granted injunctive relief. *See Golf Club* v. *Briggs, Inc.*, 198 Va. 586, 95 S.E.2d 233 (1956). Nevertheless, the determination whether to award an injunction is to be made by the chancellor, in the exercise of his discretion, after balancing the equities. *See Seventeen, Inc.* v. *Pilot Life*, *supra*, 215 Va. at 78-79, 205 S.E.2d at 652.

■ The McCauleys, while conceding that the granting of an injunction is left to the discretion of the chancellor, insist that in this case the denial of injunctive relief was an abuse of discretion. We do not agree.

The chancellor grounded his denial of injunctive relief on his finding that there was no evidence of substantial damage to the Mc-Cauley property caused by the discharge of water through the drainpipe. The chancellor reasonably could have inferred from the evidence that an injunction would have rendered the main Phillips building unusable because of surface water. There was also evidence that an injunction would afford no relief to the McCauleys from the greater problem resulting from large quantities of surface water flowing naturally from the Phillips property. Thus, there was evidence from which the chancellor could weigh the impact an injunction would have on the Phillips property against the effect a denial of an injunction would have on the McCauley property. We cannot say that, in the process of balancing the equities, the chancellor abused his discretion in denying the injunction. *See Clayborn* v. *Camilla, Etc., Coal Co.*, 128 Va. 383, 105 S.E. 117 (1920).

■ The question remains whether the McCauleys were entitled to recover any damages. The McCauleys maintain that they proved monetary damages of approximately $300 and that the chancellor himself found that they had been damaged.

It is apparent, however, from a fair reading of the chancellor's findings, that he concluded that any damage to the McCauley property from surface water flowing from the Phillips property was

caused, for the most part, by the grading and other improvements completed by the Phillipses in the normal use of their property. He found that such improvements were not made negligently or carelessly and that the Phillipses, in using their land, had not maliciously discharged water on the McCauley property. Under these circumstances, the Phillipses would not be liable for damages to the McCauleys resulting solely from improvement of the Phillips land. *Mason* v. *Lamb, supra; Motor Company* v. *Furn. Co., supra.*

The chancellor in effect found that, after rainfalls, there was temporary flooding of a portion of the McCauley lot, resulting in inconvenience, annoyance, and temporary damage, but that the only "destructiveness", *i.e.,* permanent damage, was the removal of soil. He attributed most of the damage, both temporary and permanent, to the natural flow of additional surface water caused by improvements on the Phillips property, rather than by the discharge pipe. We hold that where no greater surface water damage occurs than would naturally result from the reasonable development of an upper landowner's property, liability will not be imposed merely due to the presence of an artificial drainage system.

The McCauleys' reliance upon *Golf Club* v. *Briggs, Inc., supra,* 198 Va. 586, 95 S.E.2d 233 (1956), is misplaced. There the chancellor awarded an injunction but no damages against an upper landowner which had collected surface water into artificial channels, diverted its natural flow, and discharged it in materially accumulated volume and accelerated flow, with silt and debris, on the lower property. Actionable damage was established by the award of injunctive relief, but the chancellor disallowed damages because they could not be established with any degree of certainty. We upheld the chancellor's disallowance of damages for the cost of installing a storm sewer across the complainant's property because the evidence failed to show with any reasonable certainty what part of the damage in that area was caused by the increased flow of water attributable to the defendant's wrongful conduct. We reversed the disallowance of damages, however, that were or could be attributable to the defendant's wrongful conduct, and remanded the case for a new trial limited to the issue of damages.

In the present case, the chancellor found no evidence of substantial damage caused by increased flow of water attributable to wrongful conduct on the part of the Phillipses. Nor was there evidence showing with reasonable certainty the insubstantial damage that resulted from such wrongful conduct. The chancellor found evi-

dence only of "potential damage" for which the Phillipses might be liable in the future.

We cannot say as a matter of law that the chancellor erred in his findings. He heard the evidence and he viewed the properties. His findings carry the weight of a jury verdict and will not be disturbed by us unless plainly wrong or without evidence to support them. *Mundy* v. *Hesson,* 215 Va. 386, 391, 209 S.E.2d 917, 921 (1974).

Accordingly, the decree of the trial court is

*Affirmed.*

CARRICO and POFF, JJ., dissent.