## CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Ralph H. Noltemeier et al.

v.

H. Brent Higginbotham et al.

February 23, 1994

Case No. C90–452

By Judge William H. Ledbetter, Jr.

This is a dispute between adjoining property owners arising from their conflicting efforts to fend off surface waters from their lands.

### Status of the Case

Mr. and Mrs. Noltemeier instituted this suit on June 29, 1990, seeking, inter alia, injunctive relief against the Higginbothams' movement of soil and gravel which "destroys the drain swale" between the properties thereby causing damage to the Noltemeiers' property. The Higginbothams filed an answer and cross-bill. The Noltemeiers responded with a demurrer to part of the cross-bill and an answer. (The demurrer has never been argued or ruled on.)

After denying the Noltemeiers' application for a temporary injunction, the court referred the case to a commissioner in chancery. The commissioner conducted an evidentiary hearing on March 2 and 5, 1993. The transcripts of that hearing comprise approximately 800 pages of testimony. Numerous exhibits were introduced. Subsequently, the commissioner filed a report to which both parties took exceptions. The court heard arguments on the exceptions on January 10, 1994, and received post-trial memoranda from counsel. This opinion letter addresses the disputed issues.

*Facts*

The Higginbothams purchased approximately 50½ acres on Lake Anna in 1972. They cleared and graded a portion of the land, drilled a well, installed a septic system, and placed a mobile home there as a weekend retreat, contemplating the construction of a permanent home at a later date. In the early 1980's, a tract next to the Higginbothams' property was developed as a residential subdivision, "Blounts Harbor." The subdivision was laid out by reference to a plat dated October 6, 1982. According to that plat, Lot 15 of Blounts Harbor abuts the Higginbotham property and shares with it a common boundary of approximately 2,800 feet.

In 1986, the Noltemeiers acquired Lot 15 of Blounts Harbor. When they began to construct a house there in the spring of 1987, the Higginbothams notified the Noltemeiers that the Blounts Harbor subdivision Plat was inaccurate as to a considerable stretch of the 2,800-foot common boundary between the parties. As a consequence of this inaccuracy, the Higginbothams warned, the Noltemeiers were building their house too close to the boundary line. (Actually, the Higginbothams had discovered the disparity between their plat and the Blounts Harbor subdivision plat some time before the Noltemeiers purchased their parcel and had brought the matter to the attention of the developers of Blounts Harbor, to no avail.) Relying on the advice and information of others and on the recorded subdivision plat, the Noltemeiers proceeded with construction. They completed their house and moved in.

Later in 1987, the Higginbothams built a house on their property, laying it off at a previously-selected site near their boundary with the Noltemeiers.

The Noltemeiers filed a boundary line suit. On February 15, 1990, that litigation (# L-88–346) concluded with a consent decree that established the common boundary basically in accordance with the Higginbothams' claim.

The Noltemeiers next sought a variance from the County sideline setback requirements. The Board of Zoning Appeals granted the variance. On certiorari to this court, the action of the Board was affirmed (# L90–685).

In 1992, the Higginbothams constructed a 70-foot long garage and outbuilding located about six feet from, and parallel to, their boundary line with the Noltemeiers.

Throughout this period of controversy and litigation, the parties have squabbled about surface water, most of which originates on the Higginbothams' property and flows toward Lake Anna along a natural swale that is located — or *was* located before the parties disturbed the earth in several respects — approximately along the common boundary line, mostly on the Noltemeier property, at the point where the Noltemeiers' house is located. The particulars of each party's actions with regard to the surface waters are crucial to a resolution of this dispute; therefore, they will be discussed with more specificity below.

### Surface Waters: The Legal Principles

The principles that govern the rights of drainage of surface waters are relatively simple. It is their application to specific fact situations that causes difficulty.

First, what is surface water? It is water that comes from rains and melting snows, and moisture of wet or boggy land, that diffuse over the surface of the ground in a casual, vagrant character. It usually flows naturally in a known direction but has no defined channel (until it eventually reaches a river, stream, lake or pond, at which time it is no longer treated as "surface water" and different legal principles apply). See *Black's Law Dictionary* (4th ed. 1951) p. 1752; 21A M.J., *Words and Phrases*, p. 395. Although the parties and the commissioner make reference to a channel, and swale, from time to time, the parties concede that the water in controversy is "surface water." They argued the case upon that theory, the commissioner based his report on that proposition, and the court finds from the evidence and arguments of counsel that the water at issue here is indeed appropriately classified as surface water.

According to the civil law, derived from the Napoleonic codes, the upper landowner is entitled to natural drainage, and the lower landowner cannot obstruct it or throw it back onto the upper land. The common law rule is different. Under that rule, surface water is regarded as a common enemy so that each landowner may rid his land of it as best he can, or protect his land from it, without regard to other landowners. Virginia has adopted a middle position, sometimes called the "modified common enemy rule." Under that rule, any landowner may treat surface water as a common enemy as long as he does not needlessly or negligently injure the enjoyment of lands of another landowner. Stated differently, the rule adopted in Virginia holds that a

landowner's actions with respect to surface water must be a reasonable use of his land for its improvement or better enjoyment and must be taken in good faith with no purpose to abridge or interfere with the rights of others and with such care with respect to the adjacent lands as not to inflict any injury beyond what is necessary. See 20 M.J., *Waters and Watercourses*, § 4; Minor, *The Law of Real Property*, vol. 1 (2d ed. 1928), pp. 167–171.

> Under the common law rule, surface water is considered a common enemy that may be fended off by each landowner. But the rule is subject to the modification in Virginia that one must so use his property as not to injure unnecessarily the property of another. The privilege to protect one's property against surface water must be exercised reasonably and in good faith and not wantonly, unnecessarily, or carelessly. *Seventeen, Inc. v. Pilot Life*, 215 Va. 74 (1974); also see *Mason v. Lamb*, 189 Va. 348 (1949), and *McCauley v. Phillips*, 216 Va. 450 (1975).

Under this rule, a landowner cannot accumulate water by artificial means or collect, and channel water by artificial means, and pour it onto the lands of another at a particular point or with considerably increased volume or intensity, to the injury of the other landowner.[1] Similarly, he cannot create artificial obstructions that unreasonably disrupt the natural flow and divert or revert the water to the injury of another. He can, however, build up his land for legitimate purposes, even though, as a consequence, rain water flows onto adjoining properties in a scattered or diffuse condition. *Mason v. Lamb, supra*; also see 20 M.J., *supra*, §§ 5 and 6.

### Commissioner's Factual Findings

Based on the evidence presented and applying the legal principles that govern surface water disputes, the commissioner found that nei-

---

[1] The commissioner correctly refused to find that the Noltemeiers' initial conduct was "in bad faith." Because they were not present when that work was done, having contracted the site preparation to others, the court agrees. However, as the commissioner pointed out, lack of bad faith is not necessary to finding a violation of the modified common enemy rule where the diversion is done in a careless or needless manner to the detriment of the other landowner. Further, it should be noted that when the problem was brought to the Noltemeiers' attention, they did nothing to correct the situation their work had created.

ther party was blameless and that both of them had acted "unnecessarily." Specifically, he found that the Noltemeiers had "unnecessarily" caused a diversion of surface water onto the Higginbothams' property when the Noltemeiers did site work to build their house. He also found that the Higginbothams had reacted "unnecessarily" by channeling the surface water into an unnatural ditch created along the Noltemeiers' property line next to their house.

although it does not have the same weight given a verdict of a jury (Virginia Code § 8.01–610), the report of a commissioner is entitled to respect; and where, as here, the evidence has been taken in his presence, his findings of fact should not be arbitrarily disturbed if supported by the record. *Jamison v. Jamison*, 3 Va. App. 644 (1987); *Hill v. Hill*, 227 Va. 569 (1984).

Upon an independent review of the record, the court is of the opinion that the commissioner's findings are amply supported by sufficient proof and, further, that he has correctly applied legal principles to the facts. In summary, the pertinent facts, in addition to those already discussed above, are as follows:

When the Noltemeiers' builder graded their lot to construct the Noltemeier residence in 1987, a natural drainage swale was filled, thereby diverting surface water toward the Higginbotham property. Although the testimony of the witnesses is in conflict about the size of the pre-construction swale and the extent of the fill or berm or "ridge" (as Mr. Higginbotham called it) created by the excavation, the commissioner concluded from the evidence that the Noltemeiers "caused a diversion of surface water flow onto the Higginbothams' property." Such a diversion of surface water from its natural course of flow is not permissible under Virginia's modified common enemy rule if the diversion deposits water on the lands of another in a concentrated fashion thereby burdening the neighboring land with additional water and the diversion is done in an unreasonable, careless, or unnecessary manner. In fact, Virginia expressly holds that if the flow of surface water is in a defined channel or watercourse, a landowner may not injure another by interfering with the natural flow. See *Mullins v. Greer*, 226 Va. 587 (1984); compare *Mason v. Lamb, supra*. The commissioner found that the Noltemeiers' diversion of surface water was unnecessary. A fair reading of his report clearly indicates that he found no need existed for the diversion onto the Higginbothams' property, or, to put it differently, that the Noltemeiers could have created a suitable home

site on their lot without throwing the surface water from its natural flow onto the Higginbothams' adjoining property. The evidence fully supports this conclusion. Thus, whether the surface water flowed in a defined channel or watercourse, as in *Mullins*, or in a more undefined diffuse manner, as in *Mason*, the Noltemeiers' actions were improper under Virginia's rule because the construction of the berm, or fill, needlessly redirected the water, in volume, onto the Higginbothams' land.

To combat the Noltemeiers' action, the Higginbothams landscaped a sizeable portion of their property by elevating their land to a higher level than the Noltemeiers' land in an area near the Noltemeier property line. As a consequence, the surface water that had been diverted from the natural swale on the Noltemeier property onto the Higginbotham property is now redirected back onto the Noltemeier property. Because the Noltemeiers have built a residence almost on top of their boundary with the Higginbothams, this "rediversion" channels the water in an area alongside the Noltemeiers' residence, increasing the risk of harm to the house. The commissioner found that this response to the water problem was unnecessary. Implicit in the report is the conclusion that the Higginbothams' regrading of their land so as to put the water back onto the Noltemeiers' land, especially in a location next to their residence, was needlessly done. The evidence fully supports this conclusion.

At bottom, this case is about two adjoining landowners, each of whom has sought in his own way to rid his property of unwanted surface water, heedless of the rightful concerns of the other.

### The Appropriate Relief

As a result of the above-mentioned factual findings and conclusions, the commissioner recommended an equitable remedy. The remedy suggested is, in essence, "half a loaf" to each party. The parties would split the costs of correcting the flow of water alongside the Noltemeiers' house by installation of a pipe. The pipe would be installed under the supervision of special commissioners appointed by the court. The installation would follow the recommendations of Michael E. Bagley, the Noltemeiers' engineer, who would make "all determinations as to what is practicable." (It is interesting to note that the experts who testified in this case are unanimously of the opinion that this surface

water problem can be readily solved by installation of "V" ditches, or pipes, for less than the costs of this litigation.)

The commissioner's earnest desire to solve the problem in a manner that burdens each party equally is admirable. However, upon a review of the record and the applicable legal authorities, the court is of the opinion that such an adjudication is inappropriate in this case.

Therefore, while affirming all of the commissioner's factual findings and recitations of applicable law, the court rejects the commissioner's recommended remedy. Because the Noltemeiers set in motion this entire controversy by needlessly diverting surface water from a natural swale on their property onto the Higginbotham property, they are not entitled to the equitable relief sought in their bill of complaint. Similarly, because the Higginbothams repelled the invasion of surface water by needlessly redirecting it, thereby creating a channel of water on the Noltemeier property alongside the Noltemeiers' residence, they are not entitled to the equitable relief sought in their cross-bill.

### Drainage from the Higginbothams' New Outbuilding

Having disposed of the more significant issues — i.e., the diversion and rediversion of surface waters on the lands of these parties — one other issue needs to be addressed. The Noltemeiers contend that the gutters and downspouts on the Higginbothams' outbuilding, located almost directly on the property line, add water to the low area alongside their house. The outbuilding was erected by the Higginbothams in 1992. It is 70 feet long and runs parallel to the boundary line with the Noltemeiers. It is approximately six feet from the line. The photographs in evidence show the direction of the downspouts and the proximity of them to the Noltemeiers' property.

The commissioner recommended that the Noltemeiers be protected from this water flow. He incorporated that recommendation in the other recommended relief that the court has rejected. Thus, the relief to which the Noltemeiers are entitled with respect to the water from the gutters and downspouts of the outbuilding must be dealt with separately.

It is established that the right of drainage from *land* is distinct from the right of drainage from a *building*. Although the latter is a branch of the subject of surface water, the rules are different. Stated succinctly, there is no natural right of drainage from the roof of a building. *Minor, supra*, p. 171. Therefore, a person cannot erect a building near or over

the property of another in such a way that the gutters and downspouts, artificial channels, pour the water from the building onto the adjoining property to the injury of the adjoining landowner.

Accordingly, the Noltemeiers will be granted an injunction against the collection and pouring of water onto their property through the gutters and downspouts of the Higginbothams' outbuilding, and the Higginbothams will be directed to relocate and/or redirect such gutters and downspouts, or otherwise abate the flow, so that such water does not intrude upon the Noltemeiers' property.

## Costs

The court agrees with the commissioner that each party should bear his own expenses, and each party should pay one-half of the court costs (including the commissioner's fee, which the court finds to be reasonable).