# CIRCUIT COURT OF ALBEMARLE COUNTY

Sequel Investors,
Ltd. Partnership, *et al.*

v.

Albemarle Place EAAP,
L.L.C., et al.

November 25, 2014

Case No. CL13-199

By Judge Cheryl V. Higgins

This matter came to be heard on June 3-5, 2014, upon Plaintiffs' Complaint for Declaratory Action and Injunctive Relief. Count I is an action for Nuisance and Prospective Nuisance. Count II is an action for Intentional Trespass. The Court heard the opening statements of counsel and heard testimony of the witnesses. Thereafter, both parties submitted post-trial memorandum briefs, which the Court has now had an opportunity to consider along with the evidence presented at trial and the exhibits. This letter will set forth the Court's findings and the ruling thereupon.

The material facts in this case do not appear to be disputed by the parties and, therefore, the Court is going to dispense with setting forth the evidence regarding the factual background in this case.

"The question presented is whether Albemarle Place has the right to channelize its excess storm water onto its neighbors, thereby injuring its neighbors and appropriating its neighbors' developable property." Plaintiffs' Memorandum in Law in Support of Their Complaint for Declaratory and Injunctive Relief, p. 5. Plaintiffs argues that the 72-inch pipe, the fundamental cause of the injurious water, is an artificial channel under *McCauley v. Phillips*, 216 Va. 450, 454 (1975) ("Under an exception to the modified common law rule, however, we have held that a landowner may not collect surface water into an artificial channel and discharge it in concentrated form upon the land of another to his injury.").

Plaintiffs are undoubtedly correct in the contention that the situation giving rise to this litigation falls under Virginia's common law definition of trespass. An action for common law trespass to land derives from the general principle of law that every person is entitled to the exclusive and peaceful enjoyment of his own land and to redress if such enjoyment shall be wrongfully interrupted by another. A trespass is an unauthorized entry onto property which results in interference with the property owner's possessory interest therein. Thus, in order to maintain a cause of action for trespass to land, the Plaintiffs must have had possession of the land, either actual or constructive, at the time the trespass was committed. In addition, to recover for trespass to land, a plaintiff must prove an invasion that interfered with the right of exclusive possession of the land and that was a direct result of some act committed by the defendant. Any physical entry upon the surface of the land constitutes such an invasion, whether the entry is a walking upon it, flooding it with water, casting objects upon it, or otherwise. *Kurpiel v. Hicks*, 284 Va. 347, 353-54 (2012). In the case at bar, Defendant has erected a storm sewer system that increases both the rate and volume of storm water entering Plaintiffs' properties.

Working in tandem with the definition of trespass as a cause of action is Virginia's modified common enemy doctrine as applied to surface water. Although "surface water is a common enemy, and each landowner may fight it off as best he can," he must do so "reasonably and in good faith and not wantonly, unnecessarily, or carelessly." *Mullins v. Greer*, 226 Va. 587, 589 (1984). This rule does allow an upstream landowner in certain circumstances to divert water or flood a downstream property, but it also imposes a duty to do so with a reasonableness of care.

The Virginia Supreme Court's application of the modified common enemy doctrine in *Third Buckingham Community, Inc. v. Anderson*, 178 Va. 478 (1941), suggests that the reasonableness standard is in regards to the injury caused by the defendant's actions, rather than the actions themselves. In that case, the Court noted "The defendant emphasizes the fact that the plaintiff, in answer to questions propounded to him, said that the defendant's improvements on its lands were reasonable, and the use to which it had applied them was also reasonable, as was the location of streets and ways. . . . But this does not impair the force of the main contentions of the plaintiff." *Id.* at 487 (holding that the collection of surface water in an artificial channel and depositing it in a concentrated form with great force and violence upon the garden and plant beds of the plaintiff was unreasonable and thus actionable as trespass). *Third Buckingham* does not include a detailed recitation of facts, but it is entirely plausible to apply this analysis to the case at bar.

The Plaintiffs argue *Third Buckingham* makes clear the acceptance of a modified common enemy doctrine prohibits even reasonable discharges of channelized surface water and diverted stream water. The Court finds this interpretation of the ruling in *Third Buckingham* to be overbroad. In

discussing the limitation of the right of a landowner to take measures to protect his property from surface water, the Virginia Supreme Court stated "It must be a reasonable use of the land for its improvement or better enjoyment and the right must be exercised in good faith, and with no purpose to abridge or interfere with the rights of others, and *with such care with respect to the property that may be affected by the use or improvement as not to inflict any injury beyond what is necessary.*" *Id.* at 486 (emphasis added). The Virginia Supreme Court found, when the defendant so arranged his drainage as to collect surface water falling directly onto the ground and rain falling on the roofs of extensive apartments into a concentrated form to a two feet in diameter pipe within inches of the plaintiff's property, it resulted in extensive damage to the plaintiff's property beyond what was necessary. The debris left on the property was described as "rock and clods of dirt, potted plants and pots from Mr. Anderson's property, large rocks, fairly large rocks, six or eight inches in diameter, and they were strewn practically the full width of the property."

In further support of this finding that there is not an absolute bar to channeling water onto another's property, it is noted in *Third Buckingham*, that it is generally recognized a landowner cannot collect surface water onto an artificial channel or volume or precipitate it and greatly increase the natural quantities upon its neighbor to the *substantial* injury of the latter.

Plaintiffs' reliance on this argument requires a finding that the trespassing water in question is "channelized" rather than "diffuse" or "surface flow." It is stream water directed to Plaintiffs' harm. *Compare Third Buckingham*, at 486 *with Mullins*, 226 Va. at 589. Defendants contend that the offending water in question is a watercourse rather than surface water. This is not an instance of a distinction without a difference, as different common law rules govern. Defendants argue that the installation of the storm sewer system, including the 72-inch pipe, constitutes "reasonable" management under the common enemy doctrine. Under the common law surface water rule, surface water is a common enemy, and each landowner may fight it off as best he can, provided he does so reasonably and in good faith and not wantonly, unnecessarily, or carelessly. Accordingly, one may in the reasonable development of his property grade it or erect a building thereon and not be liable for discharging additional diffused surface water as a result thereof. *Mullins v. Greer*, 226 Va. 587, 589 (1984). In support of the contention of reasonableness, Defendants emphasize such factors as (1) it is not common practice to create drainage systems that take into account "100 year" storms and (2) the plans and construction were in accordance with the permits issued by the County of Albemarle and the City of Charlottesville.

However, the Plaintiffs are correct that the evidence shows the harm is caused by the diversion of surface water by the 72-inch pipe. As such, Defendants' stronger arguments focus on the rules for surface water and, more importantly, the burden of proof on the Plaintiffs for granting injunctive relief.

Even if the Court finds that it was stream water diverted to the Plaintiffs' harm, this Court must then determine based upon the facts presented whether Albemarle Place's storm water management plan and the installation of the 72-inch pipe inflicted injury to the Plaintiffs beyond what is necessary in designing its system.

In the Plaintiffs' case in chief, Mr. Rotgin was asked specifically how the property was harmed by the water from the 72-inch pipe. His response was the erosion and the likelihood it will only increase over time. Scott Russell Collins also testified there is erosion within the post office easement and it will increase over time.

With the existing current conditions, Mr. Rotgin testified Sequel cannot build on its property because there would be back water and it would trespass on the post office property, which Sequel cannot do as long as they are flooding a neighbor. He was also concerned about protecting the impact to the dam since it was built approximately 30 years ago. The "biggest harm" was that Sequel cannot use its private property and Albemarle Place was exporting the cost of the storm water from their property to the Sequel property and making millions of dollars on their land. In weighing the injury, the Court did find it significant that there has been no critical slopes waiver granted. However, there is a $150,000 bond in place to address erosion issues.

Mr. Jessup's description of the harm was similar. He testified we have been restricted from building in the south based on the 72-inch pipe. The expansion goes up to the tip of the property. They need to have access behind the building. This expansion is necessary for the health of the business

Yet he testified on cross-examination that the plan for the southern expansion was submitted in 2012 and it was put on hold because the city could not process a critical slopes waiver (that is what he was told). After the request was deferred, he did not request City Council to go forward with the request. "Our advisors assured us we pretty much would not get it." Because of this delay, he decided to build the northern expansion in May of 2012. He did not have time for the Sinclair problem to resolve itself so they went forward with the northern expansion. The planning commission meeting did not happen to concern the critical slope waiver until June of 2013. At that point, they had finished the northern expansion.

Mr. Charles Rotgin admitted he was aware in 2007 that the water was backing up on Albemarle Property because of the 42-inch pipes when there were storms. It was his understanding that, during a very heavy storm that the water would run over on Route 29. The witness understood that the 42-inch pipe was backed up and, if it was not unstopped, Route 29 could be inundated. This Court finds that neither Virginia law nor standard storm water engineering practice requires a developer to detain and treat water off site; so there was clearly a storm water management problem which Albemarle Place could address if the design did not injure the Plaintiffs' property beyond what was necessary.

The defense presented evidence which showed the storm water management design was done in such a matter to limit the injury to the Plaintiffs' property while still remaining in compliance with the necessary governmental regulations. Mark Ram testified, and he is the Director of Community Development for Albemarle County. He reviews and approves community development. He was familiar with Stonefield, and he approved the final storm water management and storm water control. It was found to be consistent with the county comprehensive plan, which wanted to see development for potential tax revenue.

He testified he approved the 72-inch pipe and found that the plan did comply with Minimum Standard 19 of the erosion control regulation. He did hear that there was an indication Minimum Standard 19 had not been satisfied but, after the fact, there was nothing to show that it had not been satisfied.

He also testifies that the County checks to see if there are health and safety issues associated with the runoff.

He was also asked about whether a detention facility can be approved with 40-inch vertical walls. His response was that it was so far out of the ordinary that it would cause the staff to give it strict scrutiny. Part of the issue seemed to be that such a vertical wall would be too deep for a backhoe if and when maintenance was done, which was anticipated to be every five years. In addition, a 300 foot wide detention facility could be an attractive nuisance.

While the Court agrees that Albemarle Place is not "immunized" as a result of obtaining the proper permits, the Court does consider such testimony significant towards its determination as to whether the injury inflicted went to the Plaintiffs' property beyond what was necessary in designing the system.

Randy Diamond also testified that the plan for Albemarle Place with the 72-inch pipe met the standard for good engineering of water management He described such design as not only appropriate but very good engineering judgment that detained water up to a 10 year storm and then would let it out at a controlled rate.

The Court finds from the testimony of Herbert White that Albemarle Place did address the erosion issue in the development of its storm water management plans. Mr. White was offered by the defense as an expert on storm water management and engineering. He introduced defense Exhibit 7, which was an erosion sediment control plan to meet state regulations. The erosion sediment plan was approved of April 2011. Defense Exhibit 9 is the storm water management plan which requires Albemarle Place to contain up to a ten year storm water in order to avoid flooding the downstream neighbor. It was testified that this plan was also approved. Defense Exhibit 13 showed the underground facility that will hold 2½ million gallons of water and control the rate of the water as it comes out. For an even larger storm, Mr. White testified there is an overflow mechanism.

To further address the erosion concerns by Albemarle County, they designed an energy dissipater in connection with the riprap which protects the ground. With the energy dissipater, Mr. White explained that the water hits a wall and then another wall and then it takes the energy out of it. Mr. White was specifically asked why he designed a plan that included a 72-inch pipe underneath Route 29. He testifies that they upsize the pipe so that they can safely convey large flood events underneath Route 29. Additionally he indicated that the 72-inch pipe will not flow full; even in a 100 year storm, it would only flow half full.

In order to get these plans approved, Albemarle Place went through the process of submitting their plan to the Army Corp of Engineers. They also submitted plans to the Department of Conservation and Recreation, which did another rigorous review and checked the flow numbers. In addition, Defense Exhibit 14 is a $150,000 bond that was required by the Army Corp of Engineers for erosion and sediment control.

While the Court finds that the design still inflicted injury to the Plaintiffs, the Court does not find that it is beyond what is necessary.

Plaintiffs, in their post-trial reply brief, cite the case of *Norfolk & W. Ry. v. Carter*, 91 Va. 587, 22 S.E. 517, 519 (1895), for the position that, where surface water has been accustomed to gather and flow along a well defined channel, the property owner may not obstruct it or divert it to the injury of another. In the *Norfolk & Western* case, the defendant, in constructing a railroad line, negligently and carelessly deposited large quantities of earth, stone, gravel, and other matter upon the plaintiffs' land. This Court does not find those facts analogous where the injury inflicted in that case was significantly more destructive based on a careless and negligently designed plan.

Similarly in *Hodges Manor Corp v. Mayflower Park Corp.*, 197 Va. 334 (1955), the defendant not only constructed a new drainage where there had previously been none but also entered upon the plaintiffs' land without permission and lowered the level of a small ditch 300 feet and installed pipes directly onto the plaintiffs' property. Then the defendants discharged the surface water directly onto the plaintiffs' land. Clearly in this case, the injury to the property caused by the defendants went beyond what was necessary in designing a water management system.

Plaintiffs also include a count for private nuisance for the same actions and harm on the part of the Defendants. However, Plaintiffs rely only upon one case in their post-trial brief, *Mullins v. Morgan*, 176 Va. 201 (1940), for the basis for this cause of action. *Mullins* is factually distinguishable from the case at bar, as it concerned the diverting of a natural stream. As shown above by the arguments made in the trespass count, Plaintiffs are fundamentally concerned with the diversion of surface water. As such, the trespass claim and arguments are much stronger.

Plaintiffs' prayer is for injunctive and declaratory relief, which dispenses with much of the speculative nature of the need to prove damages in this

case (where the "10 year storm" has not occurred, etc.). "A lower landowner who establishes that he has been damaged by his neighbor's violation of the exception [to the modified common enemy rule] may be granted injunctive relief." *Id*. at 454 (*citing Golf Club v. Briggs, Inc.*, 198 Va. 586, 95 S.E.2d 233 (1956)). Plaintiffs urge the Court to apply *Norfolk S. Ry. v. E. A. Breeden, Inc.*, 287 Va. 456 (2014), to the case at bar, which does not impose the usual balancing test for the granting of an injunction when a property right is violated. "We have previously held that an injunction is the appropriate remedy for enforcement of a real property right." *See, e.g., Snead*, 279 Va. at 608, 616, 692 S.E.2d at 212, 216; *Pizzarelle v. Dempsey*, 259 Va. 521, 532, 526 S.E.2d 260, 266 (2000); *Sonoma Development, Inc. v. Miller*, 258 Va. 163, 169-70, 515 S.E.2d 577, 580-81 (1999); *Boerner v. McCallister*, 197 Va. 169, 172, 89 S.E.2d 23, 25 (1955). This is so because the violation of a real property interest is deemed "irreparable and the owner protected in the enjoyment of his property whether such be sentimental or pecuniary." *Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 62, 662 S.E.2d 44, 54 (2008) (quoting *Boerner*, 197 Va. at 172, 89 S.E.2d at 25)). "In such a case, we have noted 'that the question was not one of reasonableness, nor was it a case in which the equities should be balanced.' *Snead*, 279 Va. at 615, 692 S.E.2d at 216." *Id.*, at 464. The Plaintiffs' reliance is perhaps misplaced. The case at bar does not involve a property right in the way that *Norfolk Southern* did. In fact, it has been stipulated that no easements are at issue in this litigation.

Instead, this is a claim for trespass which, though it involves the right to quiet enjoyment of property, sounds in tort. Therefore, the general standard for the decision to grant an injunction is appropriate in the case. The principles that a court must apply in properly exercising its discretion to grant or deny a permanent injunction have been identified in prior decisions of the Supreme Court of Virginia. Under traditional equitable principles, a chancellor may enjoin a continuing trespass. However, even in a case involving a continuing trespass the guiding principle which remains constant is that the granting of an injunction is an extraordinary remedy and rests on the sound judicial discretion to be exercised upon consideration of the nature and circumstances of a particular case. Thus, in a case of a continuing trespass, if the loss entailed upon the trespasser would be excessively out of proportion to the injury suffered by the owner, or a serious detriment to the public, a court of equity might very properly deny the injunction and leave the parties to settle their differences in a court of law. The Court has also observed that, unless a party is entitled to an injunction pursuant to a statute, a party must establish the traditional prerequisites, i.e., irreparable harm and lack of an adequate remedy at law before a request for injunctive relief will be sustained. Clearly, if the Plaintiffs have no adequate remedy at law, equity will not countenance a continuing trespass merely because the trespasser, or even the public at large, will be benefited by allowing the

trespass to continue. *Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 61 (2008). Plaintiffs' better argument is that the proposed remedy is not onerous in comparison to the harm caused by the storm sewer system imposed by the Defendants in the first place.

The true strength of Defendants' position lies in the contention that Plaintiffs have failed to prove any cognizable harm arising from Defendants' actions.

Plaintiffs have, at least in part, based their prayer for relief upon plans for renovation and improvements that have either (1) never been attempted or (2) prohibited by present zoning ordinances. Moreover, the harm from erosion and other effects of the physical presence of the water is at best speculative given the testimony of experts on the state of the land at the present moment and the question of "100 year" storms.

However, Plaintiffs are correct that the simple entry of the water onto the land can constitute a trespass, without any measurable harm caused. Despite this legal fact, Defendants correctly argue that an injunction is not mandatory, nor even available, in every case. An injunction will not issue in every case of nuisance or continuing trespass, for, in determining the relief to be granted, the chancellor must consider the interests of the parties and of the public. If the harm that an injunction would cause to the defendants would be out of proportion to the injury the plaintiffs seek to remedy, a court of equity may properly deny injunctive relief. *Seventeen, Inc. v. Pilot Life Ins. Co.*, 215 Va. 74, 79 (1974). In examining the equities of the harm that an injunction would cause the Defendants in comparison to the Plaintiffs' injury, the Court finds that, while there was testimony that critical slopes waiver may have been granted in the past, there is no basis for the Court to find that a critical slopes waiver would be granted at this time. Therefore, the Plaintiffs do not have the right to build anything in the ravine because it is designated as a protected "critical slope" under the City's zoning ordinance.

Given the high expense of "restoring the status quo" requested by the Plaintiffs, a permanent injunction in this case simply is inappropriate.

For the foregoing reasons, judgment is granted to the Defendants.